# NORTHERN CENTRAL RAILWAY COMPANY *vs.* WILLIAM H. GREEN.

*Injury by Train to Horses Fastened in Trestle on Railway Track—Sufficiency of Evidence of Negligence—Contributory Negligence of Those in Charge—Construction of Code, Art. 23, sec. 287, Concerning Injuries to Cattle by Railway Companies.*

Code, Art. 23, sec. 287, provides that railroad companies shall be responsible for injuries inflicted upon cattle, horses, etc., on their roads, unless said companies can prove that the injury was inflicted without any negligence on the part of the .company or its agents. *Held,* that this statute applies to cattle, etc., estray on the railroad tracks or unattended, and does not apply to a case where horses become fastened in a trestle

on the private right of way of a railroad and the injury is inflicted by a railroad train while the servants of the owner are present endeavoring to release the animals. If these servants fail to act with promptness in flagging the approaching train, this is contributory negligence which prevents a recovery or damages for the injury.

The following hypothetical question was put to an expert locomotive engineer: "From the observation of the track which you made and your familiarity with the Westinghouse system of air brakes, what would you say as to the possibility of stopping a train, such as that described by W. in his testimony, within the space of 250 yards?" *Held,* that this question was not proper, since it omits any reference to the speed at which, according to the evidence, the train was moving when a signal of danger was first seen by the engineer, and the speed of a train is the most material factor in the inquiry within what space it can be stopped.

A pair of horses belonging to the plaintiff ran away and going upon the track of the defendant railway company became fastened in a trestle, their bodies resting on the crossties and their legs hanging below. When plaintiff's servants, from whom the horses had run away, came up to the trestle, they, with some other persons near by, endeavored, unsuccessfully, to extricate the horses. One of these persons presently went up the track to stop a train which they thought would be approaching around a curve. He met the train, which was running at the rate of twenty-five miles an hour, about 250 yards above the trestle and signalled to the engineer. The latter at once applied the emergency brakes, but the train ran on a short distance over the trestle, killing one of the horses and injuring the other. In an action against the railway company the evidence on the part of the defendant was that the train could not have been stopped before reaching the trestle after the engineer saw the signal or the danger, and there was no competent evidence on the part of the plaintiff that it could have been so stopped. *Held,* that the case should not have been submitted to the jury, since there was no evidence of any negligence on the part of the defendant in failing to use due care to avoid the injury after getting knowledge of the danger, and also because the plaintiff's servants in charge

of the horses were guilty of contributory negligence in not promptly giving notice to the engineer of the train, so that he could have had time to stop it before reaching the trestle.

*Decided February 2nd, 1910.*

Appeal from the Circuirt Court for Baltimore County (VAN BIBBER, J.).

The prayers referred to in the opinion of the Court are as follows:

*Plaintiff's 1st Prayer.*—If the jury find from the evidence in this case that the two horses mentioned in the declaration, were the property of the plaintiff, and that at the time of the happening of the accident complained of said horses had escaped from the control of the plaintiff's servants or agents and had strayed on the defendant's railroad tracks, and that while on said tracks said horses attempted to cross a bridge or culvert on said railroad, and in doing so slipped and fell on said bridge or culvert in a position from which they were unable to extricate themselves, and that said horses were on said railroad, and in such position without any fault of the plaintiff, his servants or agents, and shall further find that the agents and servants of the plaintiff exercised such diligence and care as men of ordinary care and prudence would have exercised under like circumstances, to find said horses and to extricate them from such position, and that they were unable to do so before said horses were struck by the defendant's locomotive or cars if the jury find they were so struck, and shall further find that whilst on said tracks and in such position, the defendant's locomotive or train of cars struck said horses and killed one, and so badly injured the other as to render it worthless; and shall further find that the servants or agents of the defendant in charge of said locomotive or train of cars, failed to exercise in the management thereof, such care and caution as men of ordinary care and prudence would have exercised under like circumstance, and that said horses were struck as a direct result of such failure on their

part, then the plaintiff is entitled to recover in this action whatever sum they may find from the evidence said horses to have been fairly and reasonably worth, at the time they were so struck by defendant's train. (*Granted as modified.*)

*Plaintiff's 2nd Prayer.*—If the jury find from the evidence in this case, that the two horses referred to in the plaintiff's declaration were the property of the plaintiff, and that they were on the defendant's railroad track without any fault on the part of the plaintiff or his servants or agents, and that whilst so on said railroad tracks the engine or railroad cars of the defendant struck said horses and killed one and so badly injured the other that it was thereby rendered worthless, then the plaintiff is entitled to recover in this case such sum as the jury may find from the evidence to have been the fair and reasonable value of said horses at the time they were so struck by defendant's train, unless they further find that said horses were so struck as the result of unavoidable accident on the part of the defendant. (*Granted as modified.*)

*Plaintiff's 3rd Prayer.*—If the jury find from the evidence in the case that the horses mentioned in the declaration belonged to the plaintiff, and that they were on the defendant's railroad tracks at the bridge or culvert referred to in the evidence as "Bridge A" without any fault on the part of the plaintiff, his servants or agents, and that whilst so on said railroad tracks, one of said horses was killed and the other so badly injured as to be rendered worthless by a locomotive or train of cars passing over defendant's railroad; and shall further find that such striking of said horses could have been avoided by the use on the part of the defendant's agents and employees in charge of said train, of such care and caution as men of ordinary care and caution would have exercised under like circumstances, then the plaintiff is entitled to recover whatever sum the jury may find from the evidence to have been the fair and reasonable value of said horses, at the time they were so struck by defendant's train. (*Granted as modified.*)

*Defendant's 1st Prayer.*—The defendant prays the Court to instruct the jury as matter of law, that under the pleadings in this case, there is no evidence legally sufficient to entitle the plaintiff to recover in this action against the defendant and therefore their verdict must be for the defendant. (*Refused.*)

*Defendant's 2nd Prayer.*—As matter of law, under the pleadings in this case, the plaintiff's servant or agent so far directly by his negligence contributed to the accident resulting in the death of the plaintiff's horses complained of in this case, that the plaintiff cannot recover in this action, and their verdict must be for the defendant. (*Refused.*)

*Defendant's 3rd, Prayer.*—That under the pleadings in this case, there is no evidence legally sufficient from which they can find that the horses mentioned in the evidence were struck by a train of the defendant elsewhere than on the exclusive right of way and property of the defendant; and that since there is no evidence legally sufficient from which they can find that the horses mentioned in the evidence got upon the said exclusive right of way by any wrongful act or omission of the defendant or of its servants or agents, neither the defendant nor its servants or agents in the management and control of the defendant's train mentioned in the evidence were under any legal obligation or legal duty to anticipate or to keep a lookout for the said horses being on the exclusive right of way and property of the defendant; and therefore if the jury find from the evidence that as soon as the defendant's servants and agents actually became aware of the perilous position of said horses on the bridge mentioned in the evidence from actually seeing them or otherwise, the defendant's servants and agents used reasonable and ordinary care under the circumstances to avoid injuring said horses with the defendant's train, then the verdict of the jury must be for the defendant, even although the jury may find that if the defendant's servants and agents had become aware of the perilous position of said horses on said bridge sooner than the jury find they actually did, the said servants and agents

of the defendant could have avoided the accident complained of in this case. (*Refused.*)

*Defendant's 4th Prayer.*—That under the pleadings in this case, if they find from the evidence, that the defendant's servants and agents in the management and control of the defendant's train mentioned in the evidence, as soon as they or any of them actually became aware of the perilous position of the horses mentioned in the evidence on the bridge mentioned in the evidence, by seeing said horses or otherwise, used reasonable and ordinary care under the circumstances mentioned in the evidence to avoid injuring said horses with said train, then the verdict of the jury must be for the defendant, even though the jury may find from the evidence that said horses were struck and killed or fatally injured by said train, and even though the jury may find that if the defendant's servants and agents had become aware of the perilous position of said horses sooner than the jury find they actually did, the accident complained of in this case would have been avoided. (*Refused.*)

*Defendant's 5th Prayer.*—That under the pleadings if the jury find from the evidence that the defendant's servants and agents or any of them in the management and control of the train mentioned in the evidence did not see the witness, Wm. J. Kane, waving for them to stop the said train until the engine of said train was within about 250 yards of the bridge mentioned in the evidence, and that as soon as said servants or agents, or any of them, saw the said Wm. J. Kane waving for them to stop the said train they used reasonable and ordinary care to avoid striking the horses mentioned in the evidence, but did not do so, yet the verdict of the jury must be for the defendant, even although the jury may find from the evidence that the said witness Wm. J. Kane was waving and signalling for the said train to stop while the said train was rounding the curve mentioned in the evidence near Lutherville, mentioned in the evidence, and until the said engine reached a point about 250 yards from said bridge. (*Granted.*)

*Defendant's 6th Prayer.*—That it was the duty of the plaintiff's employees, John Scarborough and Robert E. Williamson, mentioned in the evidence, after finding the horses in the bridge, as testified by them, to use all reasonable and ordinary care to prevent said horses being struck by a train of the defendant, and if the jury find from the evidence that the said employees or either of them had time, after finding the horses in said bridge as aforesaid, and if the jury find that it would have been reasonable care on their part or on the part of either of said employees to have gone up the south-bound track mentioned in the evidence, a sufficient distance to signal any trains that might have been coming south towards the said horses to stop, and could have thus prevented the accident complained of in this case; and if the jury further find that said employees or neither of them did so, then the verdict of the jury must be for the defendant; even although the jury may find that the witness Kane went up the said southbound track to signal trains coming south to the distance as testified to by him. (*Refused.*)

*Defendant's 7th Prayer.*—That there is no evidence in this case legally sufficient from which they can find that the accident resulting in the injuries to the horses complained of in this case was caused solely by the negligence of the defendant, its servants and agents, without any negligence on the part of the plaintiff or his servants or agents directly contributing thereto, and therefore the verdict of the jury must be for the defendant. (*Refused.*)

*Defendant's 8th Prayer.*—If the jury shall find from the evidence that on the 22nd day of September the horses of the plaintiff attached to the wagon were being driven along the road, and that by reason of the breaking of the pin in said wagon said horses became frightened and broke away from said wagon and escaped from said driver and ran in and upon the railroad of said defendant, and fell upon and into the bridge or culvert in said road, as testified to, and shall further find while said horses were in said bridge or

culvert the engine and freight train of said defendant going south approached said bridge, and that the engineer in charge of said engine and cars after passing Lutherville was on the lookout in his cab and saw persons standing in and upon said roadbed at and near said bridge or culvert, and supposed them to be workmen of said defendant on said road, and shall further find that within a distance of four or five telegraph poles north of said bridge a person or persons on or near said track signalled with a hat and handkerchief to said engineer to stop said train, and if they shall further find that immediately thereupon said engineer threw on the emergency brakes, applied sand to the track and reversed his engine, and was unable to stop said train before reaching said bridge, and that said engine struck said horses while in and upon said bridge, and that said horses were thereby killed, that then the plaintiff cannot recover in this action. (*Granted.*)

*Defendant's 9th Prayer.*—If the jury shall find from the evidence that the plaintiff's horses became frightened and escaped from their driver, and ran away and in and upon the roadbed of the defendant, and fell upon and into the bridge or trestle, as testified to, and further find that while in said position said horses were struck by the engine drawing a train of freight cars of said defendant, which resulted in the death of said horses, and if they shall further find from the evidence that the engineer and those in charge of said train used ordinary care and prudence in the management of the same, and could not have stopped the same in time to avoid striking said horses, that then the plaintiff cannot recover in this action. (*Granted.*)

*Defendant's 10th Prayer.*—That there is no legally sufficient evidence in the case of negligence or the want of ordinary care and prudence on the part of the agents of said defendant in the management of its engine and cars, directly contributing to the accident resulting in the death of the plaintiff's horses, and their verdict must be for the defendant. (*Refused.*)

The cause was argued before BOYD, C. J., BRISCOE, PEARCE, SCHMUCKER, BURKE THOMAS, PATTISON and URNER, JJ.

*Shirley Carter,* for the appellant.

*T. Scott Offutt* and *Ernest C. Hatch,* for the appellee.

PEARCE, J., delivered the opinion of the Court.

This suit was brought to recover damages for the killing of two horses of the plaintiff by a freight train of the defendant, while the horses were fast in a trestle bridge into which they had fallen upon the private right of way of the defendant. As the legal sufficiency of the evidence adduced to prove the negligence of the defendant, and that such negligence was the *sole* cause of the death of the horses, *without any negligence on the part of the plaintiff directly contributing thereto,* is challenged by the prayers that were refused, it will be necessary to state somewhat fully the testimony in the case.

At the time of the accident, or just before its occurrence, two of the plaintiff's servants, John Scarborough and Robert Williamson, were hauling coal in a wagon drawn by these horses, from Sherwood station on the N. C. Railway to plaintiff's residence about a mile distant. Scarborough was the plaintiff's driver, and Williamson was his helper in loading and unloading. While returning to the station with the empty wagon, both men being then in the wagon, the bolt which fastened the tongue to the wagon broke or fell out, and the horses ran off with the pole and double and single trees attached. Scarborough was pulled off the wagon by the horses, thrown down, and the reins torn from him, and Williamson was left in the wagon. When the horses reached the car from which they had been loading coal, they ran upon the track of the railway towards Lutherville, Scarborough and Williamson running after them. Learning the direction the horses had taken, these men followed up the railway and

found both horses on the south bound track fast in a trestle bridge over a small stream, both horses resting on their bellies on the ties, all four legs of each horse hanging below the ties. The pole was still attached by the neck yoke, but the double and single trees had been lost. This bridge is something over a quarter mile north of Sherwood station where the horses went upon the track, and about three quarters of a mile from Lutherville station, and between these two points the track is straight, but curves to the northeast a very short distance above Lutherville station.

William Davis was walking on the track going south as the horses approached in a run going north, and ran to meet them about ten yards south of the bridge, but was unable to stop them; and when they struck the bridge they fell through the ties as above described. Davis was a colored man and the first person at the spot, about two minutes before anyone else. He called two other colored men in a field nearby, and these came next, with another colored man, and about the same time, Scarborough came, followed by Williamson a little later. The next man on the spot was Mr. Kane, a salesman for a city firm who was driving across the track on a private road 800 feet south of the trestle, when the horses came up in front of him at full speed. He tied his horse to a fence and went up to the trestle where the horses were fast, with four colored men and two white men around them. When Scarborough came up, one of the colored men, Jenkins, told the others that if they would go and get some lumber from a shed nearby, they could get the horses out, and Scarborough and some others got a number of boards from this shed, and laid them close together on the ties, thinking by this means to get the horses out, which were then apparently uninjured and perfectly quiet. Mr. Kane testified that when he got there the pole was still attached, but was unhooked while he was there; that someone said there would be a train along shortly, and he said, "if you men will keep on carrying lumber I will go up and stop the train," and that he did then go up the track "about a quarter of a mile," and that

when he saw the engine turn the curve at Lutherville he waved his hat and handkerchief, looking toward the train all the time, and not seeing what was behind him; that the train approached and when it came up to him he jumped to the side, and turned and came back towards the bridge; that he was too far up the track to see when the horses were struck, though he knew the engine passed the bridge where the horses were, and that the engine and about half a car length were beyond the bridge when the engine stopped. One of the horses was killed outright; the other was badly injured, but after the engine was backed, it got up and could walk, but it was afterwards necessary to kill it to relieve its suffering.

Scarborough said, Mr. Kane said, while they were getting the boards, he would go up and signal the train, and he went, but that he did not know how far up he went, and that he saw the smoke of the train near Lutherville before it got to the station. Davis said he spoke to a white gentleman about stopping the train who said he would take charge of it; that he, Davis, thought the boards were of no use, and that the only way to save the horses was to have the train stopped, and get a derrick to lift them out of the trestle. Jenkins said he could see the smoke as the train came round the bend, and he said, "here comes the train," and the white gentleman replied, "you work on the horses, and I will stop the train."

The train was composed of twenty-five cars all loaded, mostly with coal, averaging thirty-four feet in length, and the grade from Lutherville to the trestle a medium down grade. The engineer, Mr. Wilson, was an experienced man running as such on that railway ten years. He said: "When I came round the curve I saw a gang of men at work, trackmen I supposed, and I ran about half the distance, probably about 275 yards, then I saw a man run up the track and wave a handkerchief. I threw my brake in emergency, threw sand on the rail, reversed my engine and ran into the horses; that was the best I could do, and I did everything that could possibly be done." He said gangs of trackmen are met every

four or five miles, and no signal is ever required for them. Their foreman looks out for them. If the men at the trestle whom he took to be trackmen, had been such, and the condition of the bridge was dangerous, the rule required them to send a man with a red flag as far up as Lutherville to signal him to stop in time to avoid the danger. He first saw the signal when he was about 275 yards from the trestle, and he supposed the bridge was in a dangerous condition. His first thought was to stop as quick as he could to avoid danger to the crew and the train. This was his duty under a strict rule.

The conductor, Mr. Miller, was on the engine at the time. He said they were about 250 yards from the trestle when he saw the man signalling, and at once he heard the air go on, and the train was going about 25 miles an hour. The fireman, Mr. Taylor, was firing as they came towards the trestle, and did not either see the men on the trestle, or the man signalling until he heard the engineer "slap on the emergency brake" when he jumped up to look, but immediately after looking into the fire box while firing, one cannot see clearly. When about two car lengths from the trestle he jumped off, as he was taking no chances, and the conductor jumped also.

The engineer said he did not see the horses until he was within about one hundred feet of the trestle, because his attention was upon stopping the train; Taylor said he did not see what was the matter until he lit on the ground, and it does not appear when the conductor first saw the horses. Riley, the flagman on the train, was in the caboose at the rear when the train stopped, and saw nothing of what occurred.

Morrison, was brakeman on the train in the middle of the train. He said that he knew from the action of the train that the emergency brakes were applied but he could not say how far they were from the bridge when they were applied and that he saw no signal at any time.

Donnelly, foreman of track gang at that section of the railway said that if they were working on that trestle and it

was necessary to flag the train, that he always sent the signal man above Lutherville on account of the grade, and that their book of rules calls for 1200 yards, but they always named a place to designate the required distance.

Mr. Fridinger for the plaintiff, in rebuttal, having been a locomotive engineer for twenty-three years and familiar with the handling of the air brake up to the year 1900, said he had seen the section of the railway used in evidence in this case, and that in his opinion with an emergency application of the Westinghouse air brake with which the train was equipped, it ought to be stopped inside of 250 yards.

To the contrary, Mr. Watkins, a locomotive engineer for ten years for defendant, and thoroughly familiar with that section of that railway, in answer to a question describing the circumstances as has been detailed herein, said positively that in his opinion that train could not have been stopped before crossing the bridge.

The above summary of the testimony is sufficiently full to permit a proper examination of the rulings on the prayers, which are brought up by the 16th exception, there being fifteen exceptions to rulings on the testimony.

The plaintiff offered three prayers all of which were granted, and the defendant offered ten, of which the 5th, 8th and 9th were granted, and all the rest were refused. We shall request the reporter to insert them all.

The principal questions are raised by these prayers. All of the plaintiff's prayers are based upon the contention that this case is within section 287 of Article 23 of the Code of Public General Laws, which is as follows:

"Railroad companies shall be responsible for injuries resulting in death, or otherwise inflicted upon any stock, as cattle, horses, hogs, sheep, etc., or by fire occasioned by their engines or carriages, upon any of their roads and the branches thereof, unless the said companies can prove to the satisfaction of the justice or other tribunal before which the suit may be tried, that the injury complained of was committed

without any negligence on the part of the company or its agents."

The defendant contends: 1st. That the above statute is not applicable to this case, and that it was error therefore to grant any of those three prayers. 2nd. That the case should have been taken from the jury as requested in the defendant's 1st, 2nd, 7th and 10th prayers, for the reasons therein stated. 3rd. That even if the statute should be held applicable, and the case be allowed to go to the jury, it was error to grant the plaintiff's prayers which ignored the evidence of contributory negligence on the part of the plaintiff. 4th. That if none of these contentions be sustained, there should still be a reversal for error in refusing the defendant's 3rd, 4th and 6th prayers.

The statute in question was enacted in 1838, and has been frequently before this Court, though the precise question here presented has never been considered, nor so far as we have been able to discover has it been decided elsewhere under a similar statute.

The statute was first considered in *Baltimore and Susquehanna R. R.* v. *Woodruff,* 4 Md. 242, where the damages claimed were caused by fire. A previous Act, Ch. 309 of 1837, made railroads responsible in damages for property injured by fire caused by engines on the road, *whether there was negligence or not.* Referring to that Act, JUDGE ECCLESTON said in *Woodruff's Case, supra:* "The Legislature deeming it too severe and rigorous, thought proper again to make the absence of negligence a defence, and for that purpose passed the Act of 1838. In doing which, we think, they have restored the rules of the common law in relation to negligence, *except only releasing the plaintiff from the obligation to prove it, and casting the onus of proving its absence on the defendant.*" And the Court there further said: "The words without *any* negligence, must mean, without any negligence occasioned by the want of *reasonable care.* * * * The statute does not give any new cause of action, nor does it give a new action to recover damages for an injury known to the com-

mon law. It *simply changes a rule of evidence,* by releasing
the plaintiff from proving negligence if the fact of the fire"
(or as in this case, the fact of the killing of the horses) "is
established, and casts the *onus* upon the defendant of showing
there *was no negligence,* or, in other words that there *was
proper diligence."*

To this construction of the statute the Court has consistent-
ly adhered in all the later cases, in accordance with the cardi-
nal rule of interpretation "that it is not to be presumed that
the Legislature intended to make any innovation upon the
common law further than the case *absolutely* required."
*Hooper* v. *Baltimore,* 12 Md. 475. The disposition of the
Court wherever the question of the construction of the stat-
ute has arisen, has been to restrict its application. This is
well illustrated in *Lamborn's Case,* 12 Md. 257, the first case
reported touching injuries to stock. In that case the Act of
1846, an amendment of the Act of 1838, was discussed, its
language requiring the defendant to prove that the injury
*was the result of unavoidable accident.* The Court said that
language imposed on the company the *highest* degree of care
and caution, but nevertheless held that the Act applied "only
to those cases where the party complaining has not contrib-
uted in any manner by his own negligence or violation of law
to the act complained of. Or in other words, the rule of the
common law to which we have adverted remains unchanged
by the Acts of Assembly to which we have referred."

In *Keech's Case,* 17 Md. 46, JUDGE BARTOL, referring to
*Lamborn's Case,* said: "We can give no other construction to
these Acts of Assembly than that which we have heretofore
declared. They leave the question of negligence on the part
of the plaintiff where it was at the common law and do not
confer upon a party who is himself a wrongdoer, the right to
obtain redress for the consequences of his own misconduct or
negligence."

In *Pumphrey's Case,* 72 Md. 82, the suit was brought to
recover the value of two mules which were killed in a colli-
sion with an engine belonging to the defendant railroad com-

pany. The mules were being driven by the plaintiff's servant with the cart to which they were attached, over a private crossing of the railroad. No bell was rung nor whistle sounded at the approach to the crossing, though there was a curve which prevented anyone from seeing the train more than thirty or forty yards from the crossing, and the train was behind its schedule time and running fifteen miles an hour. It was held that in the absence of a statute requiring a signal at private crossings, there wâs no legally sufficient evidence of negligence by the defendant, and when the plaintiff then invoked this statute to rescue the case from the common law rule, JUDGE McSHERRY said briefly: "This section shifts the burden of proof *in cases to which it* applies; but it has no relation whatsoever·to a case like the one now before us. It was designed to apply to cattle or other live stock *estray* upon the track, *or* not under the dominion or control of an intelligent agent when injured." It does not appear that there was any question of contributory negligence in *Pumphrey's Case* to take it out of the grasp of the statute, and the mules were not estray but were in the charge of the plaintiff's driver. JUDGE McSHERRY must therefore have meant that the Act did not apply, because they were in his *charge.* It is true that the words he used were, "under the dominion and control of an intelligent agent," and the meaning which the plaintiff seeks to impose upon those words in the connection in which they are there employed, is that the agent must have *such* dominion and control as to enable him to prevent their getting on the track, or to remove them at pleasure, if on the track. It is properly conceded in this case that these horses escaped upon the track without fault on the plaintiff's part, and if, having fallen in the trestle as they did, they had been injured by the train, *before the plaintiff's seravnts overtook them, and resumed charge and control of them,* a different situation would have existed. Reference to the cases of *B. & O. R. R.* v. *Mulligan,* 45 Md. 486, and *Western Md. R. R.* v. *Carter,* 59 Md. 306, we think throws a strong light upon the true meaning of JUDGE McSHERRY's

language.  In *Mulligan's Case,* the plaintiff's prayer speaks
of the cow as *"unattended at the time she was killed,"* and
the defendant's prayer speaks of it as having *"no one in at-
tendance upon her at the time she was killed."*  And in
*Carter's Case,* JUDGE ALVEY, interpreting the principle ap-
plicable to these cases, uses the same language, *"unattended."*
It cannot be presumed that "dominion and control" was in-
tended to mean *absolute dominion and control,* the absolute
power to keep the animal out of, or instantly remove it from
danger.  It must rather mean such control as domestic ani-
mals are supposed to be subject to when in the custody of the
owner or his agent.  To illustrate, let us suppose that these
horses while being driven by the master's servant had taken
fright at some object by the roadside, and getting the bit in
their teeth had run away upon a private road, crossing a
railway and had been injured or killed by a collision at that
point.  Suppose that the driver had lost all dominion or con-
trol over them, and was helpless to arrest their flight, or check
their speed, could it be contended that this statute would ap-
ply to the case?  The animals would not be estrays, or unat-
tended, they would be as fully in the care and under the man-
agement of the servant, as they were before their fright.
They would still, in legal contemplation, be in the "dominion
and control" of their driver.  In the case before us, these
horses were out of the dominion and control of the plaintiff's
servants during the interval between their escape, and the
resumption of their care and management when Scarborough
and Williamson found them in the trestle.  Before that
time, the care and caution required of them, was to keep the
horses from getting upon the track where they *might* be in-
jured by an engine.  The fact that the horses were helpless
in the trestle, and they were powerless to release them, did
not relieve them from the duty of care and caution for their
safety.  It merely changed the *character* of care and caution
required of them, and by reason of the perilous situation of
the horses, and the imminent danger of the approach of a
train at any moment, imposed upon them the highest degree

of care to warn approaching trains *with the utmost prompt-ness,* of the situation of the horses.  The effort to release them by bringing boards to place upon the ties was well meant, but ill directed, and was in disregard of the sensible suggestion of Davis that the only way to save them was to stop a train and get a derrick.  The obvious duty was to send someone immediately such a distance up the south bound track to signal the train as would ensure the ability to stop it before it reached the trestle, and this was a duty which was imposed upon the plaintiff's servants themselves, though we do not mean to say, that if timely notice were given by anyone, the defendant would not be responsible *under the common law rule,* for failure to stop in time to avoid inflicting injury.

We are of opinion for the reasons above stated, as held in *Pumphrey's Case,* that the statute does not apply to a case of this kind, and that the failure to provide with *promptness* for flagging the train, was negligence directly contributing to the injury, and for both these reasons, it was error to grant the plaintiff's prayers.

This Court has held many times that even at a public cross-ing a railroad track is in itself a signal and warning of dan-ger, because the traveller can never tell when a train will pass that point.  Upon the same principle it must be negli-gence for one whose horses are fast in a trestle upon the priv-ate way of a railroad, though without his fault, not to antici-pate the approach of a train at any moment, and to waste precious time in idle devices for the extrication of his horses, instead of acting immediately for their protection by prompt and efficient warning of all approaching trains.

It is a familiar proposition of the law of negligence that although the plaintiff may have been guilty of negligence without which the accident could not have occurred, he may yet recover, provided it is made to appear that the defend-ant, by the exercise of due care, after becoming aware of the danger to which the plaintiff's person or property was ex-posed, could have avoided the consequence of the plaintiff's

negligence, but as was said by JUDGE ALVEY in *Northern Central Railway* v. *Geis,* 31 Md. 366: "This however implies time for the one party to become aware of the conduct and situation of the other, for neither could be required to anticipate the negligence of the other."

It was for the purpose of rescuing this case from the consequence of the negligence of the plaintiff that the testimony of Mr. Fridinger, which has heretofore been set out, was offered.

He was an expert locomotive engineer, and after testifying that he had been in Court during the trial and heard the witnesses and the evidence in the case, and was familiar with the handling of the Westinghouse air brake, he was asked the following hypothetical question: "From the observation of the track which you made and your familiarity with the Westinghouse system of air brakes what would you say as to the possibility of stopping a train such as that described by Mr. Wilson in his testimony within a space of 250 yards." This question was excepted to, but the exception was overruled and he gave the answer which has already been set out.

It will be observed that this question omits any reference to the speed at which it was shown the train was moving when the signal of danger was first seen by the engineer. It goes without saying that the speed of a train is the most material factor in the inquiry within what space it can be stopped. When that element is omitted from the hypothesis the witness has no rational or legal basis upon which to support an answer. A hypothetical question must embrace every material element of the hypothesis founded upon the evidence, and it must not import into the question any element not founded upon the evidence in the case. If it offends in either respect it is defective and it is error to permit such a question to be answered, and if inadvertently admitted over an objection, it is error to refuse a motion to strike out the answer.

In *B. & O. R. R.* v. *Dever, ante,* page 296, decided at the present term, JUDGE BOYD said, in passing upon an exception to a hypothetical question relating to the infection of cattle

with Texas ticks, at a stock yard controlled by the defend-
ant railroad: "There is not one word in the question suggest-
ing that there was a dead alley ten feet wide between the two
alleys. On the contrary the inference which might be drawn
is that the alleys were contiguous. It is a very important
fact as the ticks could get through the fences more readily
than they could get over the alley and through the two
fences," and this illustrates the care with which the Court
seeks to protect parties against injury by opinion evidence
based upon a hypothesis which does not embrace every ma-
terial fact in evidence affecting the hypothesis. What we
have said is applicable both to the 10th and 11th exceptions.

When the answer to this hypothetical question is elimi-
nated, there is not a shred of evidence to show that the de-
fendant could by the utmost care and caution have stopped
the train in time to avoid striking the horses. There can be
no recovery in a case of this sort unless there is a breach of
some duty on the part of the defendant to the plaintiff by rea-
son of which breach the plaintiff has suffered injury. *Maen-
ner* v. *Carroll,* 46 Md. 212. The defendant here owed no
duty to the plaintiff in respect to the speed of the train, or in
keeping a look out for gangs of trackmen, or for trespassers
upon its exclusive right of way. The only duty owed to the
plaintiff in this case arose when and not until when, the engi-
neer saw the signal of danger given by Kane. Then it be-
came his duty to avoid injury if possible to any person, or
the property of any person exposed to danger at or near the
point where the signal was displayed. *Kehoe's Case,* 83 Md.
452. Did not the defendant's servant the engineer fully dis-
charge this duty? He testified that the moment he saw the
signal, "I threw my brake in emergency, threw sand on the
rail and reversed my engine, * * * my brakes were working
perfectly, * * * and I did all in my power to get it stopped."
He said his whole attention was given to the effort to stop
the train, that as soon as he saw the signal he thought some-
thing was the matter with the bridge, and he did not see the
horses, nor know what the trouble was until he got within

about one hundred feet of the bridge and found it was impossible to stop, when he looked to his own safety. The conductor and fireman heard the emergency brake applied and the air go on, about the distance from the bridge testified to by the engineer, though they did not see the signal until the brake was applied.

Watkins the locomotive expert of the defendant testified positively that in his opinion the train could not possibly have been stopped in that distance 250 yards, and the hypothetical question put to him embraced specifically every material factor of the hypothesis, and was not excepted to.

A very simple analysis of the testimony as to the distance between the bridge and the point where the train came in sight, will show that Mr. Kane could not by any possibility have gotten a half or a quarter of a mile up the track when he met the train.

It was 3885 feet from the bridge to Lutherville station, or approximately seven-tenths of a mile. The train was running twenty-five miles an hour, or about a mile in two minutes and a half, so that it would cover the 3885 feet in something under two minutes. If Mr. Kane is assumed to have been going up the track at the rate of four miles an hour, which is good walking speed, the train was going six times as fast as he was going, and the train would cover five-sixth of the distance while he covered one-sixth. This would bring the two together 664 feet, or 221 yards from the bridge, which nearly agrees with the testimony of the engineer, and is wholly at variance with the judgment of Mr. Kane, who in one place estimates that he had gone half a mile up the track and in another a fourth of a mile. He also testified on cross-examination that he thought it took him about two minutes to go from Parr's road where he hitched his horse to the bridge, and the draftsman of the plat in evidence testified that this was 780 feet or 260 yards.

To permit the jury to determine upon such evidence even if Mr. Fridinger's testimony were not eliminated, whether the train could have been stopped after the signal was seen, in

time to avoid the accident would have been to invite them to found their verdict upon pure speculation, and there was upon the whole case, no legally sufficient evidence to support a verdict for the plaintiff, upon the ground that the train could have been stopped in time to avoid the accident.

We are therefore of opinion that the defendant's first and second prayers which asked that a verdict for defendant be directed, should have been granted. In this view of the case it is unnecessary to consider the other prayers or any of the other numerous exceptions to the testimony, though we should add that we have discovered no error in these latter exceptions.

> *Judgment reversed without awarding a new trial, costs to be paid by the appellee above and below.*