976 A.2d 279

**Kelly GREEN, a minor, etc., et al.**

v.

**N.B.S., INC., et al.**

**No. 94 Sept.Term, 2008.**

Court of Appeals of Maryland.

July 21, 2009.

Brian S. Brown (Saul E. Kerpelman & Associates, P.A., Baltimore, MD), on brief, for Petitioners.

Petitioners Amici Curiae Brief of Maryland Ass'n for Justice: James K. MacAlister, Esq. Maryland Ass'n for Justice, Baltimore, MD.

M. Natalie McSherry (Gertrude C. Bartel and Catherine M. Manofsky of Kramon & Graham, P.A., Baltimore, MD), on brief, for Respondents.

Respondents Amici Curiae Brief of Maryland Chamber of Commerce, American Tort Reform Ass'n, Chamber of Commerce of the United States of America, Nat. Ass'n of Mfrs., American Ins. Ass'n, Property Cas. Insurers Ass'n of America, American Chemistry Council, and Nat. Ass'n of Mut. Ins. Companies Supporting Appellees and Affirmance: Mark A. Behrens, Esq., Cary Silverman, Esq., Christopher E. Appel, Esq., Shook, Hardy & Bacon, L.L.P., Washington, DC.

Respondents Brief of Amicus Curiae, Maryland Defense Counsel, Inc.: Dwight W. Stone, II, Esq., Christopher C. Jeffries, Esq., Erin L. Purdy, Esq., Whiteford, Taylor & Preston, L.L.P., Baltimore, MD.

ARGUED BEFORE BELL, C.J., HARRELL, BATTAGLIA, GREENE, MURPHY, IRMA S. RAKER, (Retired, specially assigned), and ALAN M. WILNER, (Retired, specially assigned), JJ.

MURPHY, Judge.

In the Circuit Court for Baltimore City, after a jury awarded $2,300,000 in noneconomic damages to Kelly Green,[1] Peti-

---

1. In the Circuit Court, the last name of Petitioner and her mother was spelled "Greene." We shall spell Petitioner's name "Green," which is

tioner, for injuries resulting from her exposure to lead-based paint, the Circuit Court entered the following ORDER:

The jury in the above-captioned case on March 26, 2007, having entered verdict in the above-captioned case in favor of the Plaintiff, and said verdict being in excess of those damages allowable pursuant to § 11–801, Courts and Judicial Proceedings Article, Annotated Code of Md., and the court having considered the provisions of said statutory authority and the evidence presented, does hereby reduce the amount of judgment to conform with said limitation.

It is this 5th day of April, 2007,

ORDERED that judgment be entered in the above-captioned case in favor of Plaintiff, Kelly Green[ ], A Minor by her Mother and Next Friend, Celestine Green[ ], against all defendants in the sum of five hundred and fifteen thousand dollars ($515,000).

The Circuit Court also assessed costs against all of the Defendants/Respondents: Stanley Rochkind (the only Respondent who has filed briefs in the Court of Special Appeals and in this Court), N.B.S., Inc., Charles Runkles, and Dear Management, Inc.

In *Green v. N.B.S., Inc.*, 180 Md.App. 639, 952 A.2d 364 (2008), while affirming the judgment of the Circuit Court, the Court of Special Appeals (1) held "that the statutory cap as set forth in Md.Code. (2006 Repl. Vol.), Cts. & Jud. Proc. Art., sections 11–108 and 11–109 applies to all actions for personal injury and wrongful death, including actions based on statutory or constitutional violations[,]" *Id.* at 642, 952 A.2d at 366; (2) rejected the argument that "the statutory cap is unconstitutional because it constitutes a 'special law' that is barred by Article III, section 33 of the Maryland Constitution[,]" *Id.* at 661, 952 A.2d at 377; and (3) concluded "that the complaint [Petitioner] filed, and the cause of action to which the cap

---

the spelling used by the parties in this Court and in the Court of Special Appeals.

statute was [properly] applied, arose after October 1, 1995, but before October 1, 1996." *Id.* at 662–63, 952 A.2d at 378.

Petitioner thereafter filed a petition for writ of certiorari in which she requested that this Court answer the following questions:

    I.  WHETHER THE TRIAL COURT ERRED IN APPLYING MARYLAND'S "CAP" ON NONECONOMIC DAMAGES TO REDUCE THE JURY'S AWARD IN THIS CASE[?]

    A.  WHETHER THE TRIAL COURT ERRED IN RULING THAT MARYLAND'S "CAP" ON NONECONOMIC DAMAGES APPLIES TO CLAIMS BROUGHT PURSUANT TO MARYLAND'S CONSUMER PROTECTION ACT[?]

    B.  WHETHER THE TRIAL COURT ERRED IN RULING THAT THE "CAP" IS CONSTITUTIONAL[?]

    II.  WHETHER, ASSUMING *ARGUENDO* THAT THE "CAP" APPLIES TO THIS CASE, THE TRIAL COURT ERRED IN RULING THAT THE APPROPRIATE "CAP" IS $515,000 RATHER THAN $530,000[?]

This Court granted that petition. 406 Md. 192, 957 A.2d 999 (2008). For the reasons that follow,[2] we shall affirm the judgment of the Court of Special Appeals.

### Background

Prior to trial, Celestine Green dismissed her "individual" claims. Petitioner's evidence included the videotaped deposition testimony of Dr. John F. Rosen. The following transpired during Dr. Rosen's direct examination:

---

**2.** The brief that Respondent Rochkind filed in this Court includes the argument that, "Petitioner cannot recover non-economic personal injury damages in a private cause of action brought pursuant to the Maryland Consumer Protection Act." We shall not consider that argument, which was not presented to the Circuit Court or to the Court of Special Appeals, and which was not raised in a cross-petition for certiorari. Md. Rule 8–131(b)(1).

[PETITIONER'S COUNSEL]: Now looking at [Plaintiff's Exhibit] No. 7, [a summary of Petitioner's lead level tests] and this document, just so you know, Dr. Rosen, will be blown up so the jury can see it as you're talking about it even though they're not here with us today, could you please tell us if you found any indication of whether or not to a medical degree of medical probability of whether [Petitioner] was poisoned?

WITNESS: She was lead poisoned by definition as of September 26, [1996].

[PETITIONER'S COUNSEL]: How long, let's go back a second. You told us that her first blood lead level according to Exhibit No. 7 was in November of 1995, a blood level of 9. Is that correct?

WITNESS: Yes.

[PETITIONER'S COUNSEL]: Can you tell the members of the jury to a reasonable degree of medical probability as to whether that blood lead level amount has any medical significance to you as a pediatrician (inaudible)?

WITNESS: It does.

[PETITIONER'S COUNSEL]: And what significance is that?

WITNESS: The significance of that is the blood lead value of 9 when she was roughly 10 months old followed about five weeks later with a blood lead of 8 micrograms per deciliter, both indicated that she was within 10 to 20 percent of reaching the level of 10 micrograms per deciliter and that indicates that she was (inaudible) exposed to lead during that time frame prior to the lead level (inaudible) deciliter.

[PETITIONER'S COUNSEL]: Does the fact, to a reasonable degree of medical probability, that [Petitioner] did not reach the definition of lead poisoning, that is 10 micrograms per deciliter, mean that those two levels did not affect her or did not cause her any injury?

WITNESS: They did impact her in terms of (inaudible) that blood lead range, in terms of loss of IQ points, yes.

Prior to jury deliberations, the Circuit Court entered judgment against all Respondents on the issue of whether they were negligent in their ownership and/or management of the property where Petitioner was exposed to lead-based paint, as well as on the issue of whether they had violated the Consumer Protection Act. Counsel to the parties agreed that the jury should be presented with a VERDICT SHEET that contained two questions:

1. Do you find that Kelly Green suffered any injury as previously defined for you in my instructions?

   If your answer is YES, . . .

2. What amount of damages, if any, do you award Plaintiff Kelly Green for:

   Non-economic damages sustained in the past and reasonably probable to be sustained in the future for injuries found to her mental health and well-being: $_____

The jury received the following instructions:

Ladies and gentlemen, the Court has found that the Defendants, NBS, Incorporated; Dear Management, Inc.; Charles Runkles, individually; and Stanley Rochkind, individually, were negligent as it pertained to their duties owed at 1547 Montpelier Street in Baltimore City, Maryland, and that this conduct was in violation of the Consumer Protection Act. You are instructed that proximate cause exists only where the Plaintiff produces evidence that indicates that it is more probable than not that there is a direct connection between the act complained of and the act finally resulting in injury.

For the Plaintiff to recover damages, the Defendant's negligence must be a cause of the Plaintiff's injury. Each person whose negligent act is a cause of an injury is responsible.

You are instructed that proximate cause exists only w[h]ere the Plaintiff produces evidence that indicates that it is more probable than not that there is a direct connection

between the act complained of and the act finally resulting in the injury.

The burden is on the Plaintiff to prove by a preponderance of the evidence each item of damage claimed to be caused by the Defendants. In considering the items of damage, you must keep in mind that your award must fairly and adequately compensate the Plaintiff, but an award should not be based upon guesswork or speculation.

In this action for damages you shall consider the following—the personal injuries sustained by the Plaintiff and their extent and duration—and by the Plaintiff, we mean Kelly Green[ ]—the effect the injuries have on the overall mental health and well being of the Plaintiff, which with reasonable probability may be expected to be experienced in the future.

In awarding damages in this case you must itemize your verdict or award to show the amount intended for the non-economic damages, if any, sustained in the past and reasonably probable to be sustained in the future by the Plaintiff, for injuries found to her mental health and well being.

The record shows that the following transpired when the jury returned its verdict.

THE CLERK: ... Kelly Green[ ], a minor by her mother and next friend, Celestine Green[ ], Plaintiff versus NBS, Inc., et al, Defendants, .... Verdict Sheet, Issue 1, "Do you find that Kelly Green[ ] suffered any injury as previously defined for you in my instructions, yes/no?"

JURY FOREPERSON: Yes.

THE CLERK: Issue 2. "What amount of damages, if any, do you award Plaintiff, Kelly Green[ ], ...?

JURY FOREPERSON: 2.3 million.

After the Circuit Court entered judgment,[3] Petitioner filed a Motion for Reconsideration and/or Motion to Alter or Amend Judgment that included the following assertions:

---

**3.** Although the record shows that the judgment was "entered" (and/or "reentered") on other dates, it is clear that a timely appeal was

1. On or about March 26, 2007, after a lengthy trial, the jury returned a verdict in favor of the minor plaintiff in the amount of Two Million Three Hundred Thousand Dollars ($2,300,000.00). This sum represented compensation for brain damage sustained as a result of lead poisoning.

2. Prior to the return of the verdict, this Honorable Court had directed a verdict against all the defendants on the issue of defendants' negligence and their violations of the Maryland Consumer Protection Act (CPA).

\* \* \*

6. Further, even if the Cap is constitutional, which Plaintiff expressly denies, it does not apply in this case. The Cap does not apply in this case because the jury's award was for defendants' violation of the CPA, a statutory cause of action and, pursuant to Section 3(i) the limitation imposed by the Cap applies only to "victims of tortious conduct." In other words, a violation of the CPA is not a tort. Since the Cap only applies to awards for tortious conduct, the Cap does not apply in this case, and this Honorable Court should not have reduced the jury's verdict.

7. The logic set forth above was adopted by the Court of Appeals in *United States v. Streidel*, 329 Md. 533, 620 A.2d 905 (1993). In *Streidel*, the Court of Appeals refused to apply the Cap to the statutory cause of action of wrongful death cases because, among other reasons, such causes of actions are not traditional tort actions for personal injury. After *Streidel*, the legislature amended the act to include actions for wrongful death. Interestingly, the legislature did not amend the Cap to include other statutory cause of actions, such as actions for injuries like those in this case, caused by violations of the CPA. In fact, the legislature specifically added section 3(i) which expressly limits application of the CAP to causes of actions for tortious conduct. As the legislature is presumed to know the law, it must be assumed that it intended to limit the instances when the

---

ultimately noted from the denial of Petitioner's Motion to Alter or Amend Judgment.

Cap applies to non-tortious conduct only to wrongful death actions.

In *Edmonds v. Murphy,* 83 Md.App. 133, 573 A.2d 853 (1990) *aff'd, Murphy v. Edmonds,* 325 Md. 342, 601 A.2d 102 (1992), the Court of Special Appeals, speaking of wrongful death actions, said: "[t]he General Assembly would be well within its authority to abolish wrongful death actions if it chose to do so. Certainly, it would be well within its authority to repeal the 1969 statute permitting recovery for noneconomic loss in wrongful death actions. Within its powers to create a cause of action or abolish a **statutory cause of action** is the **power to modify** such statutory actions." In the case at bar, the legislature created the statutory cause of action under the CPA. It could have, if it so chose, limited (modified) damages recoverable pursuant to the Cap. It chose not to do so. This Honorable Court should not have reduced the jury's verdict.

(Emphasis in original).

Subsequent to a hearing on the post-judgment motions, the Circuit Court filed a Memorandum Opinion that included the following findings and conclusions:

Motions were filed on behalf of the Plaintiffs for Reconsideration and/or Alteration or Amendment of the Judgment. Those arguments fall into two distinct categories.

I. Assuming that the provisions of Md. Ann.Code § 11–101 *et seq.,* Cts. & Jud. Proc. apply, Plaintiffs assert that the judgment should be reduced to $530,000. The Court, pursuant to § 11–108(d), entered judgment in the amount of $515,000. The relevant consideration is whether the statutory authority of § 11–108 that raises the "cap" on noneconomic damages effective October 1, 1996 is the appropriate measure for these damages. All parties agree that the evidence indicated that the minor Plaintiff had an elevated lead blood level on September 26, 1996.

Plaintiffs assert that since the Baltimore City Housing Code has been interpreted to establish a continuous duty upon the landlord of premises to keep subject property in

compliance with the Code, any potential causes of action that arises from a landlord's violation of said Code also continue and, therefore, the "cap" date should be the last date upon which Plaintiff's exposure generated an elevated lead blood level. The Court rejects this analysis. . . .

Here, the verdict sheet submitted to the jury, which was agreed upon by all parties, did not request the jury to decide the date upon which any cause of action arose. Accordingly, this Court is unwilling to substitute its judgment for that of the jury, which made its finding as to non-economic damages sustained by Plaintiffs upon the evidence produced at trial. Since the evidence is undisputed that the minor Plaintiff sustained an elevated blood level on September 26, 1996, the Court sees no reason to amend the judgment to reflect a cause of action arising at a later date.

II. In the alternative, Plaintiffs assert that the provisions of § 11–108 are inapplicable to this matter. Plaintiffs argue that not all of its asserted causes of action are brought as personal injury actions that arose out of direct tortious conduct, *see* § 11–108(A)(b)(3)(i), but that asserted causes of action also arise out of Defendants' violations of the Maryland Consumer Protection Act, Md. Ann.Code, § 13–301, *et seq.*, Comm. Law, and the Baltimore City Code, Art. 13 *et seq.*, Housing and Urban Renewal. Accordingly, Plaintiff asserts that since those claims fall outside of the statutory scheme envisioned by the legislature in enacting § 11–108, any damages awarded for those claims were not intended to be reduced. Plaintiffs argue that since actions for wrongful death were specifically addressed by the statute, the fact that the legislature did not address other nontortious causes of action supports the position that § 11–108 is inapplicable in this matter.

Again, the Court is unpersuaded by Plaintiffs' argument. . . . [A]s discussed *supra*, all parties agreed on the verdict sheet submitted to the jury, which did not ask the jury to differentiate between potential causes of action and award damages accordingly. It is therefore impossible for the Court, after the fact, to parse out which damages were

awarded for which claims and to do so would improperly infringe on the decision of the jury panel.

Accordingly, Plaintiffs' Motion for Reconsideration and/or Motion to Alter or Amend Judgment is hereby denied.

Petitioner noted a timely appeal to the Court of Special Appeals. As stated above, after that Court affirmed the judgment of the Circuit Court, this Court issued a writ of certiorari.

## Discussion

### I. A.

■ Petitioner was entitled to bring an action under the Maryland Consumer Protection Act (CPA), which is set forth in Title 13 of the Commercial Law Article (CL). CL § 13–408, in pertinent part, provides:

(a) *Actions authorized.*—In addition to any action by the Division or Attorney General authorized by this title and any other action otherwise authorized by law, any person may bring an action to recover for injury or loss sustained by him as the result of a practice prohibited by this title.

Section 11–108 of the Courts and Judicial Proceedings Article (CJ) provides:

Personal injury action—Limitation on noneconomic damages

(a) Definitions.—

(1) In this section the following words have the meanings indicated.

(2) (i) "Noneconomic damages" means:

1. In an action for personal injury, pain, suffering, inconvenience, physical impairment, disfigurement, loss of consortium, or other nonpecuniary injury; and

2. In an action for wrongful death, mental anguish, emotional pain and suffering, loss of society, companionship, comfort, protection, care, marital care, parental care, filial care, attention, advice, counsel, training, guidance, or edu-

cation, or other noneconomic damages authorized under Title 3, Subtitle 9 of this article.

(ii) "Noneconomic damages" does not include punitive damages.

(3) "Primary claimant" means a claimant in an action for the death of a person described under § 3–904(d) of this article.

(4) "Secondary claimant" means a claimant in an action for the death of a person described under § 3–904(e) of this article.

(b) Limitation on amount of damages established.—

(1) In any action for damages for personal injury in which the cause of action arises on or after July 1, 1986, an award for noneconomic damages may not exceed $ 350,000.

(2) (i) Except as provided in paragraph (3)(ii) of this subsection, in any action for damages for personal injury or wrongful death in which the cause of action arises on or after October 1, 1994, an award for noneconomic damages may not exceed $ 500,000.

(ii) The limitation on noneconomic damages provided under subparagraph (i) of this paragraph shall increase by $15,000 on October 1 of each year beginning on October 1, 1995. The increased amount shall apply to causes of action arising between October 1 of that year and September 30 of the following year, inclusive.

(3) (i) The limitation established under paragraph (2) of this subsection shall apply in a personal injury action to each direct victim of tortious conduct and all persons who claim injury by or through that victim.

The brief that Petitioner filed in the Court of Special Appeals includes the following argument:

As can be seen from the plain language of Section 3(i), in order for the Cap to apply two conditions precedent must be satisfied: First, there must be a "personal injury section" and second, there must be a victim of *"tortious" conduct.* Appellant does not dispute that this case is a "personal injury action." However, not all personal injury actions are

based on a defendant's "tortious" conduct. Sometimes, as in this case, personal injury actions are based upon statutory causes of action. Because a cause of action based on the CPA is a statutory cause of action and not a tort, the Cap does not apply and the trial court erred when it reduced the jury's award.

(Emphasis in original).

The brief that Petitioner filed in this Court includes the following argument:

This case is not a "personal injury action." . . . Petitioner's claim under the CPA is not a "personal injury action" because, in furtherance of the Legislature's wishes, Petitioner is seeking **relief** from Respondents' prohibited deceptive practices, **not** compensation for the personal injuries she sustained.

(Emphasis in original).

■ Under these circumstances, Respondent Rochkind argues that (in the words of his brief), "Petitioner cannot assert, for the first time in this Court, and in direct contradiction to her earlier judicial statements, that her action for damages is not for personal injury." We shall, however, hold that Petitioner's CPA claim *is* a personal injury action, and that CJ § 11–108 is applicable to a proceeding in which a consumer asserts a claim for money damages to compensate for injuries sustained as a result of a Consumer Protection Act violation.

Applying the doctrine of *ejusdem generis* to § 11–108(a)(2)(i),[1] it is clear that the cap statute is applicable to

---

**4.** In *Tribbitt v. State*, 403 Md. 638, 943 A.2d 1260 (2008), this Court stated:

The doctrine of *ejusdem generis* applies when the following conditions exist: (1) the statute contains an enumeration by specific words; (2) the members of the enumeration suggest a class; (3) the class is not exhausted by the enumeration; (4) a general reference supplementing the enumeration, usually following it; and (5) there is not clearly manifested an intent that the general term be given a broader meaning than the doctrine requires.

*Id.* at 657, 943 A.2d at 1271 (quoting *In re Wallace W.*, 333 Md. 186, 190, 634 A.2d 53, 55–56 (1993)).

brain injuries sustained as a result of lead poisoning. In rejecting Petitioner's argument that the cap statute does not apply because a CPA action "is a statutory cause of action and not a tort," the Court of Special Appeals stated:

> "Tortious" is defined as "[c]onstituting a tort; wrongful." Blacks Law Dictionary 1497 (7th ed. 1999). A "tort" is defined as "[a] civil wrong for which a remedy may be obtained, usually in the form of damages; a breach of a duty that the law imposes on everyone in the same relation to one another as those involved in a given transaction." *Id.* at 1496. Therefore, the term "tort" as defined by Blacks encompasses all "civil wrongs," not just wrongs that were recognized as a civil wrong at common law.

180 Md.App. at 646–47, 952 A.2d at 369.

The Court of Special Appeals' analysis of the words "tortious conduct" included a discussion of *Lee v. Cline,* 384 Md. 245, 863 A.2d 297 (2004), in which this Court was presented with the issue of whether State personnel have immunity from liability for tortious acts or omissions that violate State constitutional rights. The Court of Special Appeals stated:

> In *Lee,* the Court [of Appeals] interpreted the term "tortious act or omission" to include causes of action to recover for constitutional torts. 384 Md. at 266[, 863 A.2d at 310]. This is important for our purposes because a constitutional tort is obviously not a "common law" tort.
> * * *
> Although perhaps not dispositive of the issue here presented, the interpretation of the term "tortious injury" by the *Lee* Court at least suggests that the term "tortious conduct" includes more than conduct that constituted a tort at common law.

*Id.* at 647, 649, 952 A.2d at 370.

The Court of Special Appeals then cited several "long-arm statute cases," as well as "numerous other cases from other jurisdictions standing for the proposition that the fact that a cause of action arises out of a statute does not mean that a tort has not been committed." *Id.* at 651, 952 A.2d at 372.

As to Petitioner's reliance on *United States v. Streidel*, 329 Md. 533, 620 A.2d 905 (1993), the Court of Special Appeals stated:

> The *Streidel* Court never used the phrase "traditional tort action for personal injury" in its analysis and nothing said in *Streidel* supports [Petitioner's] position that one of the reasons that the cap statute was deemed inapplicable to a wrongful death action was because such actions were not "traditional tort action[s]." The crux of the *Streidel* decision was that wrongful death statute cases were not governed by the cap statute because such suits did not assert a claim for personal injury. *Id.* at 539–44[, 620 A.2d at 908–11].

180 Md.App. at 653, 952 A.2d at 373.

After discussing "the pertinent legislative history behind the 1994 amendment to the cap statute," the Court of Special Appeals stated:

> It is clear to us that the legislature added the language, upon which appellant relies, in order to answer the question that the *Streidel* Court had left unanswered, i.e., to make it clear that cap amounts are applied to the tort victim and all persons who claim injury by or through that victim in a personal injury or a wrongful death action.
>
> We do not believe that the legislature, when it amended the cap statute, intended to expand the statute to cover wrongful death actions but at the same time intended to narrow its application so that rather than applying "to all actions for personal injuries," as it did before the amendment (*Kent Village [Associates Joint Venture v. Smith]*, 104 Md.App. [507,] at 532, 657 A.2d 330), it was now to cover wrongful death actions and all actions for personal injury so long as the victims were injured as the result of common law torts. One reason for reaching this conclusion, aside from the ones already discussed, is the fact that nothing in the rather extensive legislative history surrounding the enactment in 1994 of Senate Bill 283 gives any indication that the General Assembly wanted to narrow the scope of

the cap statute in any respect. More specifically, nothing in the legislative history suggests that the General Assembly even thought of the difference between actions claiming personal injury due to common law torts as opposed to causes of action claiming personal injury arising out of statutory or constitutional torts. And, when interpreting a statute, a court must presume that the legislature did not intend to make any alteration other than what is specified and plainly pronounced. *N. Cent. Ry. Co. v. Green,* 112 Md. 487, 76 A. 90 (1910). Also, in light of the reasons for the original cap statute, and its amendment, it is impossible to believe that the legislature intended to narrow the statute in the way appellant suggests so that insurers would now have to cover non-economic damages awards that exceeded the cap so long as the personal injury action arose out of the violation of a statute or a constitutional provision.

180 Md.App. at 659–60, 952 A.2d at 376–77. (Footnote omitted). We agree with that analysis, and affirm the holding of the Court of Special Appeals "that the [C]ircuit [C]ourt was correct when it ruled that the cap statute applied to appellant's claim for damages that arose, in part, out of a violation of the CPA." *Id.*

### I. B.

There is no merit in Petitioner's argument that CJ § 11–108 violates the prohibition against the enactment of "special laws," which is set forth in Section 33 of Article III of the Maryland Constitution. In *Prince George's Co. v. B. & O. R.R. Co.,* 113 Md. 179, 77 A. 433 (1910), this Court stated that "[a] special law is one that relates to particular persons or things of a class, as distinguished from a general law which applies to all persons or things of a class." *Id.* at 183, 77 A. at 434. In *State v. Burning Tree Club, Inc.,* 315 Md. 254, 554 A.2d 366 (1989), this Court stated:

In *Cities Service Co. v. Governor,* 290 Md. 553, 567, 431 A.2d 663 (1981), this Court examined decisions applying § 33, concluding that "no mechanical rules for deciding cases" exist. Nonetheless, the Court enumerated several

factors to be considered in deciding whether a statute is a "special law." The Court reiterated the importance of these factors in *State v. Good Samaritan Hospital,* 299 Md. 310, 473 A.2d 892 (1984). The factors include: whether "the underlying purpose of the legislation is to benefit or burden a particular class member or members"; whether particular people or entities are identified in the statute; and what "the substance and 'practical effect' " of a statute is and not simply its form. *State v. Good Samaritan Hospital, supra,* 299 Md. at 330, 473 A.2d at 902; *Cities Service Co. v. Governor, supra,* 290 Md. at 569, 431 A.2d at 672–673. Our past decisions have also considered whether particular entities or individuals sought and obtained special advantages under the legislation or if other similar entities or individuals were discriminated against by the legislation. *Cities Service Co., supra,* 290 Md. at 570, 431 A.2d at 673. In deciding whether a law violates § 33 in applying to only certain members of a class, we have looked to whether the statute's distinctions are arbitrary or unreasonable. *Ibid.* Moreover, this Court has held that some enactments were not special laws even though they applied to only a single entity. Such laws are permissible where unique circumstances render the entity a class unto itself, *Cities Service Co., supra,* 290 Md. at 568, 431 A.2d at 672, or where the enactment, although it affects only one entity currently, would apply to other similar entities in the future, *Reyes v. Prince George's County,* 281 Md. 279, 305–306, 380 A.2d 12 (1977); *Potomac Sand & Gravel v. Governor,* 266 Md. 358, 379, 293 A.2d 241 (1972).

*Id.* at 273–74, 554 A.2d at 376.

The Court of Special Appeals noted that Petitioner's "special law" argument was identical to the argument rejected by that Court in *Univ. of Maryland Med. Sys. Corp. v. Malory,* 143 Md.App. 327, 795 A.2d 107 (2001), *cert. denied* 368 Md. 527, 796 A.2d 696 (2002). The *Malory* Court stated:

Here, we are faced with the task of determining whether a statute applying to all tort victims in the State of Maryland is a "special law." The law simply does not have the same

effect as the statute at issue in *Cities;* rather, C.J. § 11–108 applies to *"any* action for damages for personal injury." (Emphasis added.) Therefore, it is a general law and does not violate the constitutional prohibition.

*Id.* at 354, 795 A.2d at 122–23. (Emphasis in original). We agree with the Court of Special Appeals that the cap statute is not a "special law."

## II.

■ Petitioner argues in the alternative that, even if the "cap" applies, she is entitled to a judgment in the amount of $530,000 rather than $515,000. According to Petitioner, because she was "continuously exposed" to the lead paint, her cause of action "continued" to arise after October 1, 1996. In *Green v. N. Arundel Hosp. Ass'n,* 366 Md. 597, 785 A.2d 361 (2001), this Court stated:

> [A] cause of action in negligence arises when facts exist to support each element of the action. The elements of a cause of action for negligence are (1) a legally cognizable duty on the part of the defendant owing to the plaintiff, (2) a breach of that duty by the defendant, (3) actual injury or loss suffered by the plaintiff, and (4) that such injury or loss resulted from the defendant's breach of the duty. *Brown v. Dermer,* 357 Md. 344, 744 A.2d 47 (2000); *Valentine v. On Target, Inc.,* 353 Md. 544, 727 A.2d 947 (1999). As we noted in *Owens–Illinois [v. Armstrong,* 326 Md. 107, 604 A.2d 47 (1992)], in a negligence action, the elements of duty, breach, and causation tend naturally to precede the element of injury, which "would seemingly be the last element to come into existence." *Owens–Illinois,* supra, 326 Md. at 121, 604 A.2d at 54. Accordingly, in determining when, in a time sense, a cause of action for negligence arises, the focus is often on when that last element of injury occurs.

*Id.* at 607, 785 A.2d at 367.

This theory is inconsistent with Petitioner's fifteen count Complaint, which contains five "negligence" counts that include the following assertions:

10.   That the Plaintiff was exposed to the toxic conditions complained of herein on each and every instance in which the Plaintiff was present at the property.   Each and every instance of exposure resulted in the introduction of lead into the Plaintiff's bloodstream.   This lead in the Plaintiff's bloodstream caused immediate permanent cellular damage in each instance.   Lead was deposited in the Plaintiff's internal organs—spleen, liver and kidneys—and in the Plaintiff's brain and bones.   In addition to the aforesaid immediate injury, the lead also caused permanent continuing chronic injury.   Lead, once introduced into the human body, is very, very slowly eliminated.   Lead is released from bone over years.   [T]hus leaving aside the actual period of exposure, even after exposure cased the Plaintiff continued with lead throughout the Plaintiff's body and during that entire following period the Plaintiff continued to suffer injury, disruption of normal bodily functions, and cellular destruction and retardation.

This theory is also inconsistent with the theory of the case presented to the jury.   The opening statement of Petitioner's trial counsel included the following comments:

No level of lead is safe in a child, . . . lead is a toxin, . . . there [is an] inverse relationship between lead and I.Q. That means the more lead you have the less your I.Q., inverse, opposite.

Lead has been associated with learning disabilities and the most common source of lead in children is what?   Lead-based paint . . . which is why we're here today, is the most important source of lead exposure.   A blood lead level equal to or greater 10 micrograms per deciliter is the definition of childhood lead poisoning and you know what?   There is no safe level of lead.   The doctor that we have is going to show you, ladies and gentlemen.   That's lead and look at Kelly's lead levels [shown on Plaintiff's Exhibit No. 7].   She had twice the level of lead that the CDC says is the definition of [lead poisoned].   And there is no safe level and all those levels that you see[.]

Moreover, Petitioner's trial counsel elicited Dr. Rosen's expert opinion that Petitioner "was lead poisoned by definition as of September 26, [1996]." In *Owens–Illinois v. Armstrong,* 326 Md. 107, 604 A.2d 47 (1992), this Court relied upon expert testimony presented at trial for its holding that, "[t]he only reasonable conclusion, even viewed in the light most favorable to Owens–Illinois, is that Armstrong had asbestosis prior to July 1, 1986." *Id.* at 124, 604 A.2d at 55.

On the basis of Dr. Rosen's testimony, Petitioner had sustained a legally cognizable injury no later than September 26, 1996. We therefore agree with the Circuit Court and the Court of Special Appeals that Petitioner's cause of action arose prior to October 1, 1996. Under these circumstances, the jury's verdict was properly "capped" at $515,000.

**JUDGMENT OF THE COURT OF SPECIAL APPEALS AFFIRMED; PETITIONER TO PAY THE COSTS.**