952 A.2d 364

**Kelly GREEN, a Minor, etc., et al.,**

v.

**N.B.S., INC., et al.**

**No. 1258, Sept. Term, 2007.**

Court of Special Appeals of Maryland.

July 2, 2008.

Brian S. Brown (Saul E. Kerpelman & Associates, PA on the brief), Baltimore, for appellant.

Elaine R. Wilford (Ralph E. Wilson, Rollins, Smalkin, Richards & Mackie on the brief), Baltimore, for appellee.

Argued before SALMON, JAMES R. EYLER and ROBERT L. KARWACKI (Ret., Specially Assigned), JJ.

SALMON, J.

Although there are two other matters presented, the most important issue raised in this appeal is whether the Maryland statute, which sets a cap on recovery for non-economic damages, applies to all actions for wrongful death and personal injury or only to causes of action for wrongful death and personal injury based on conduct that constituted a tort at

common law. We shall hold that the statutory cap as set forth in Md.Code. (2006 Repl.Vol.), Cts. & Jud. Proc. Art., sections 11–108 and 11–109 applies to all actions for personal injury and wrongful death, including actions based on statutory or constitutional violations.

## I.

Kelly Green ("Kelly"), a minor, by her mother and next friend, Celestine Green, ("Ms.Green") appeals a decision that was later reflected in an order to apply Maryland's statutory cap on non-economic damages to a jury verdict entered against Stanley Rochkind, N.B.S., Inc., Charles Runkles and Dear Management, Inc. (collectively "appellees"). The verdict was entered in a lawsuit Ms. Green filed against appellees for injuries Kelly suffered due to her exposure to lead-based paint while living at 1547 Montpelier Street in Baltimore, Maryland. Appellees' conduct in failing to maintain the property resulted in their being found liable for common law negligence as well as for violations of Maryland's Consumer Protection Act ("CPA"). *See* Md.Code., (1975, 2005 Repl.Vol.), §§ 13–101 *et seq.* of the Commercial Law Article. Over Ms. Green's objection, the verdict was reduced from $2,300,000 to $515,000.

## II.

Ms. Green gave birth to Kelly on January 16, 1995. Ms. Green had been living at 1547 Montpelier Street for approximately eight months prior to Kelly's birth. When Ms. Green moved into the house there was chipping paint around the window frames in the bedrooms as well as around several doorways within the home. Paint would fall to the floor whenever Ms. Green lifted the windows or closed the doors.

Kelly was diagnosed with having an elevated lead level in November 1995, when she was ten months old. After appellees were informed of Kelly's condition, appellees' agents failed to scrape off all the lead based paint and instead painted over some of it. Due to the condition of the house and Kelly's

diagnosis, Ms. Green and Kelly moved to another location in November 1997.

Ms. Green, as Kelly's next friend, brought suit against the appellees in the summer of 2002. The complaint alleged that appellees were negligent in their ownership and/or management of 1547 Montpelier Street and, due to their negligence, Kelly was exposed to chipping, flaking and peeling lead-based paint. The complaint also alleged that appellees violated the CPA because,

> by marketing, and otherwise making available to the public for lease ... [they] impliedly represented that the [Montpelier home] was in compliance with the [Baltimore] Housing Code and other Public Local Laws of Baltimore City and statutes of the state of Maryland and of the United States and thus was fit for human habitation and contained no flaking, loose or peeling paint or plaster, or lead based paint accessible to children.

According to the complaint, appellees "knew the dwelling was not fit for human habitation and contained flaking, loose or peeling paint or plaster or lead-based paint accessible to children."

A jury trial commenced on March 19, 2007. Dr. John F. Rosen was called as an expert witness by appellant. He established that the Center for Disease Control ("CDC") considers a child with blood levels of 10 or more micrograms per deciliter ("mg/dl") of lead to be lead poisoned. In Dr. Rosen's opinion, however, a child may lose IQ points even if that child has a blood lead level of less than 7.5 mg/dl.

Kelly's blood was tested seven times for the presence of lead. Those tests yielded the following results:

| Date | Lead Level |
| --- | --- |
| 11/15/1995 | 9 mg/dl |
| 04/10/1996 | 8 mg/dl |
| 09/26/1996 | 20 mg/dl |
| 12/02/1996 | 15 mg/dl |
| 12/1996 | 12 mg/dl |
| 01/01/1997 | 8 mg/dl |
| 09/13/1997 | 8 mg/dl |

Based upon Kelly's blood level values and upon peer review literature, Dr. Rosen opined that her exposure to lead caused Kelly to lose 10 IQ points.[1]

At the close of the entire case, the court granted judgment in favor of Kelly's mother and against the appellees as to liability based on common law negligence and violation of the CPA. The only issues submitted to the jury were (1) whether Kelly suffered any injury due to appellees' wrongful conduct and, (2) if so, the amount of non-economic damages she suffered.

After the court, *sua sponte*, reduced the $2,300,000 verdict to $515,000, appellant filed a Motion for Reconsideration and/or Motion to Alter or Amend Judgment arguing that the statutory cap was not applicable to the CPA claim and, alternatively, even if the cap was applicable to all claims, the appropriate cap should have been $530,000. Both motions were denied.

## III.

■ Appellant argues that the damages cap only applies to common law tort actions. This is important, appellant maintains, because an action brought by a plaintiff seeking damages for personal injury as a result of a violation of the CPA is not a common law tort action.

---

1. Testing revealed that Kelly has a current IQ of 105. Evidence was presented by appellees to demonstrate that Kelly was performing very well in school. For instance, reports were submitted and signed by Kelly's third grade teacher, in which it was noted that Kelly was a Student Council representative, a well-behaved student, an honor roll student, and the winner of a dramatic reading contest for the school. While Kelly was in third grade, she was reading at a sixth grade level, her arithmetic skills were at a fifth4 grade level, and her work recognition skills were on a seventh grade level.

Saundra Adams was the principal of Kelly's elementary school while Kelly was in the third grade through the time that she was in the fifth grade. Ms. Adams testified that while Kelly was in fifth grade, she was ranked as the second or third highest student in the school at her grade level. In fifth grade, Kelly received the Principal's award, which is awarded to "students who have maintained themselves academically [and] have participated in extra curricular activities."

Section 11–108 of the Cts. & Jud. Proc. Art., provides, insofar as here pertinent:

(a)(1) In this section the following words have the meanings indicated.

(2)(i) "Noneconomic damages" means:

1. In an action for personal injury, pain, suffering, inconvenience, physical impairment, disfigurement, loss of consortium, or other nonpecuniary injury; and

2. In an action for wrongful death, mental anguish, emotional pain and suffering, loss of society, companionship, comfort, protection, care, marital care, parental care, filial care, attention, advice, counsel, training, guidance, or education, or other noneconomic damages authorized under Title 3, Subtitle 9 of this article.

\* \* \*

(b)(1) *In any action for damages for personal injury in which the cause of action arises on or after July 1, 1986,* an award for noneconomic damages may not exceed $350,000.

(2)(i) Except as provided in paragraph (3)(ii) of this subsection, *in any action for damages for personal injury* or wrongful death in which the cause of action arises on or after October 1, 1994, an award for noneconomic damages may not exceed $500,000.

(ii) The limitation on noneconomic damages provided under subparagraph (i) of this paragraph shall increase by $15,000 on October 1 of each year beginning on October 1, 1995. The increased amount shall apply to causes of action arising between October 1 of that year and September 30 of the following year, inclusive.

(3)(i) The limitation established under paragraph (2) of this subsection shall apply in a personal injury action to each direct victim of *tortious conduct* and all persons who claim injury by or through that victim.

(ii) In a wrongful death action in which there are two or more claimants or beneficiaries, an award for noneconomic damages may not exceed 150% of the limitation estab-

lished under paragraph (2) of this subsection, regardless of the number of claimants or beneficiaries who share in the award.

(Emphasis added.)

In support of her argument appellant stresses that section 11–10 8(b)(3)(i) uses the term "victim of tortious conduct." She also emphasizes that a claim under the CPA is statutorily created. This, of course, is true. Appellant then argues:

As can be seen from the plain language of Section 3(i), in order for the Cap to apply two conditions precedent must be satisfied: First, there must be a "personal injury action" and second, there must be a victim of *"tortious" conduct.* Appellant does not dispute that this case is a "personal injury action." However, not all personal injury actions are based on a defendant's "tortious" conduct. Sometimes, as in this case, personal injury actions are based upon statutory causes of action. Because a cause of action based on the CPA is a statutory cause of action and not a tort, the Cap does not apply and the trial court erred when it reduced the jury's award.

(Emphasis supplied in original.)

Section 11–108 does not define the words "tortious conduct" and there are no reported cases from either this Court or the Court of Appeals where the interpretation of those words, as used in the cap statute, were already at issue.[2] We shall, therefore, begin by examining the dictionary definition of the words in controversy. *See Marriott Employees Fed. Credit Union v. Motor Vehicle Admin.*, 346 Md. 437, 447, 697 A.2d 455 (1997) ("Although dictionary definitions do not provide dispositive resolutions of the meaning of statutory terms, dictionaries do provide a useful starting point for determining

---

**2.** In *MaryCLE, LLC v. First Choice Internet, Inc.*, 166 Md.App. 481, 530, 890 A.2d 818 (2006) we characterized, in dicta, violations of the CPA as "tortio us". *See also T–UP, Inc. v. Consumer Prot. Div.*, 145 Md.App. 27, 72, 801 A.2d 173 (2002) (" 'a CPA violation is in the nature of a tort action.' ") (quoting *Hartford Accident & Indem. Co. v. Scarlett Harbor Assocs. Ltd. P'ship*, 109 Md.App. 217, 265, 674 A.2d 106 (1996) *aff'd.*, 346 Md. 122, 695 A.2d 153 (1997)).

what statutory terms mean, at least in the abstract, by suggesting what the legislature could have meant by using particular terms.") (internal citations and quotation marks omitted). "Tortious" is defined as "[c]onstituting a tort; wrongful." Blacks Law Dictionary 1497 (7th ed.1999). A "tort" is defined as "[a] civil wrong for which a remedy may be obtained, usually in the form of damages; a breach of a duty that the law imposes on everyone in the same relation to one another as those involved in a given transaction." *Id.* at 1496, 697 A.2d 455. Therefore, the term "tort" as defined by Blacks encompasses all "civil wrongs," not just wrongs that were recognized as a civil wrong at common law.

In *Lee v. Cline*, 384 Md. 245, 863 A.2d 297 (2004), the Court was called upon to decide whether "the Maryland Tort Claims Act grants qualified immunity to state personnel for *tortious acts or omissions*, within the scope of the state employees' public duties, when those acts or omissions involve violations of state constitutional rights...." *Id.* at 255, 863 A.2d 297. At issue was the interpretation of Md.Code (2004 Repl.Vol.), State Government Article, section 12–105 [part of the Maryland Tort Claims Act], which in material part reads:

§ **12–105. Immunity.**

State personnel shall have the immunity from liability described under § 5–522(b) of the Courts and Judicial Proceedings Article.

Section 5–522(b) of the Courts and Judicial Proceedings Article states:

(b) State personnel, as defined in 12–101 of the State Government Article, are immune from suit in courts of the State *and from liability in tort for a tortious act or omission* that is within the scope of the public duties of the State personnel and is made without malice or gross negligence, and for which the State or its units have waived immunity under Title 12, Subtitle 1 of the State Government Article, even if the damages exceed the limits of that waiver.

(Emphasis added.)

In *Lee,* the Court interpreted the term "tortious act or omission" to include causes of action to recover for constitu-

tional torts. 384 Md. at 266, 863 A.2d 297. This is important for our purposes because a constitutional tort is obviously not a "common law" tort. The *Lee* Court said:

> While this Court has not, until today, directly decided whether intentional torts and constitutional torts are covered by the Maryland Tort Claims Act, thereby granting state personnel qualified immunity for such torts, our prior opinions do support such coverage. *See Larsen v. Chinwuba,* 377 Md. 92, 99, 107–109, 832 A.2d 193 (2003) (A tort action against the Insurance Commissioner setting forth causes of action for defamation, invasion of privacy, abuse of process, *and violation of rights guaranteed by the Maryland Declaration of Rights,* and this Court held that the Commissioner was entitled to immunity under the Maryland Tort Claims Act, although the issue before the Court concerned scope of employment rather than the basic coverage of the statute); *Okwa v. Harper,* 360 Md. 161, 757 A.2d 118 (2000) (A tort action against state governmental officials based upon allegations of various common law intentional torts, *violations of the federal constitution, and violations of the state constitution,* and the issues included (1) the sufficiency of the evidence to show malice, thereby defeating Maryland Tort Claims Act immunity, (2) liability under 42 U.S.C. § 1983, and (3) the inapplicability of the public official immunity doctrine to state constitutional torts; the Court held, *inter alia,* that there was sufficient evidence of malice to defeat Maryland Tort Claims Act immunity, although no other issue was raised regarding the coverage of the Act); *DiPino v. Davis,* 354 Md. 18, 49–56, 729 A.2d 354 (1999) (*Holding that there was coverage under the Local Government Tort Claims Act for certain intentional and constitutional torts* ); *Ashton v. Brown,* 339 Md. 70, 107–108, 123–124, 660 A.2d 447 (1995) (same)....

*Id.* at 257–58, 863 *A.*2d 297 (emphasis added).

Although perhaps not dispositive of the issue here presented, the interpretation of the term "tortious injury" by the *Lee* Court at least suggests that the term "tortious conduct"

includes more than conduct that constituted a tort at common law.

In support of her argument that "[a] cause of action based on a statutory right is not a tort", appellant cites to two out-of-state cases, viz.: *Facchina v. Mut. Benefits Corp.*, 735 So.2d 499 (Fla.Dist.Ct.App.1999) and *Treanor v. Metro. Transp. Auth.*, 414 F.Supp.2d 297, 303–05 (S.D.N.Y.2005).

In *Facchina*, the District Court of Appeals of Florida held that a statute that created a claim for unauthorized publication of a person's likeness was "based not on tort or contract law but on a statutory right"; therefore, the economic loss rule, which is a judicial limitation on common law remedies in tort and contract, did not apply. 735 So.2d at 502. In reaching this conclusion, however, the Court noted that the text of the statute evidenced the legislature's intent not to apply judicial limits on common law remedies (i.e., the economic loss rule) to the new statutory cause of action. *Id.* As will be demonstrated *infra*, nothing in the text of the cap statute or in its legislative history suggests that the cap statute was intended to apply only to common law torts.

Appellant is correct when she states in her brief that *Treanor*, which was a case interpreting New York law, held that appellant's discrimination claim was not a tort and was therefore not subject to a one-year statute of limitations applicable to causes of action against the Long Island Railroad "founded on tort."[3] The *Treanor* Court concluded, citing

---

**3.** The appellant in *Treanor* was a former employee of the Long Island Railroad (LIRR). The statute of limitations interpreted in *Treanor* read:

(1) As a condition to the consent of the state to such suits against the [LIRR], in every action against the [LIRR] for damages, for injuries to real or personal property or for the destruction thereof, or for personal injuries or death, the complaint shall contain an allegation that at least thirty days have elapsed since the demand, claim or claims upon which such action is founded were presented to a member of the [LIRR] or other officer designated for such purpose and that the [LIRR] has neglected or refused to make an adjustment or payment thereof.

An action against the [LIRR] *founded on tort* except an action for wrongful death, shall not be commenced more than one year after the

several decisions by New York state courts, that the statute at issue (along with a similar one covering suits against the New York City Transit Authority) "were designed for traditional tort actions" and thus were not intended to cover a statutory tort. *Id.* at 301–02.

Courts in other states have interpreted the phrase "tort" far more broadly than did *Treanor*, at least in the context of applying various long-arm statutes.

Maryland's long-arm statute is found in Maryland Code (2006 Repl.Vol.) of the Courts and Judicial Proceedings Article, section 6–103. Subsections (b)(3) and (4) of section 6–103 use the term "tortious injury." The phrase is used in the following context:

(b) A court may exercise personal jurisdiction over a person who directly or by an agent:

\* \* \*

(3) *Causes tortious injury* in the State by act or omission in the State;

(4) *Causes tortious injury* in the State or outside of the State by an act or omission outside the State if he regularly does or solicits business, engages in any other persistent course of conduct in the State or derives substantial revenue from goods, food, service, or manufactured products used or consumed in the State.

Although no reported appellate court decision in Maryland has construed the term "tortious injury" in the context of our long-arm statute, the court in *Craig v. Gen. Fin. Corp. of Illinois,* 504 F.Supp. 1033, 1037 (D.Md.1980), did construe that phrase. The *Craig* Court held that the fact that a cause of action is statutory is irrelevant to the issue of whether the

---

cause of action therefor shall have accrued, nor unless a notice of claim shall have been served on the [LIRR] within the time limited by and in compliance with all the requirements of section fifty-e of the general municipal law.

414 F.Supp.2d at 301 (emphasis added) (quoting N.Y. Pub. Auth. L. § 1276(1)-(2)).

defendant committed a tortious act in Maryland resulting in injury in Maryland for purposes of construing Courts & Judicial Proceedings Article, section 6–103(b). *See also Cable/Home Communication Corp. v. Network Prods., Inc.*, 902 F.2d 829, 856–57 (11th Cir.1990) (finding violation of state and federal copyright and communications laws to be sufficient to trigger jurisdiction under Florida's long-arm statute, which required a "tortious act" within the state); *Williams Elec. Co., Inc. v. Honeywell, Inc.*, 854 F.2d 389, 394 (11th Cir.1988) (violation of state and federal antitrust laws constitutes "tortious behavior" under Florida's long-arm statute); *Barclay v. Hughes*, 462 F.Supp.2d 314, 317 (D.Conn.2006) (Title 42, Section 1983 civil rights violation constitutes a tort for purposes of Connecticut's long-arm statute); *Teleco Oilfield Servs., Inc. v. Skandia Ins. Co.*, 656 F.Supp. 753, 758 (D.Conn.1987) ("alleged violations of the Connecticut Unfair Insurance Practices Act ... and the Connecticut Unfair Trade Practices Act" constituted "tortious conduct" for purposes of Connecticut's long arm statute); *Overby v. Johnson*, 418 F.Supp. 471, 472–73 (E.D.Mich.1976) (construing phrase "action in tort" as used in Michigan long-arm statute as including an action for violation of rights protected by Title 42, Section 1983 civil rights action); *Albert Levine Assocs. v. Bertoni & Cotti*, 314 F.Supp. 169, 171 (S.D.N.Y.1970) (Clayton Act violation, although "purely statutory," constitutes a "tortious act" for purposes of New York's long-arm statute); *Bucchere v. Brinker Int'l, Inc.*, 49 Conn.Supp. 441, 891 A.2d 1008, 1015 (2005) ("Conduct is 'tortious' for the purpose of jurisdiction when it violates a state statute."); *Black v. Rasile*, 113 Mich.App. 601, 318 N.W.2d 475, 476 (1980) (phrase "action for tort" in state long-arm statute "should be construed as including statutory causes of action because a tort is a breach of a noncontractual legal duty, the source of which may be statutory as well as common law.").

In addition to long-arm statute cases, there are numerous other cases from other jurisdictions standing for the proposition that the fact that a cause of action arises out of a statute does not mean that a tort has not been committed. *See, e.g.,*

*Elvig v. Calvin Presbyterian Church,* 397 F.3d 790, 793 (9th Cir.2005) (Title VII of the Civil Rights Act of 1964 creates statutory torts); *Schobert v. Illinois Dep't of Transp.,* 304 F.3d 725, 731 (7th Cir.2002) (same); *Fenton v. HiSAN, Inc.,* 174 F.3d 827, 829–30 (6th Cir.1999) (same); *see also Home Builders Ass'n of Greater St. Louis v. L & L Exhibition Mgmt., Inc.,* 226 F.3d 944, 947 (8th Cir.2000) (the Lanham Act "has been broadly construed by the federal courts as making certain types of unfair competition federal statutory torts") (quotation omitted); *Bangor Punta Operations, Inc. v. Universal Marine Co.,* 543 F.2d 1107, 1109 (5th Cir.1976) (same).

Appellant also relies on *United States v. Streidel,* 329 Md. 533, 620 A.2d 905 (1993), in support of her position. In *Streidel,* the Court of Appeals was asked by the United States Court of Appeals for the Fourth Circuit to answer the following question:

Whether the Maryland solatium cap of $350,000 is applicable to each claimant of solatium, or is it a comprehensive overall solatium maximum applicable only once, no matter how many claimants there are.

*Id.* at 535, 620 A.2d 905.

The *Streidel* Court held that it was unnecessary to decide the certified question, because Maryland's cap statute did not apply to wrongful death actions. *Id.* at 552, 620 A.2d 905. This holding overruled *Potomac Electric Power Co. v. Smith,* 79 Md.App. 591, 558 A.2d 768 (1989).

Appellant asserts that the *Streidel* Court "refused to apply the [statutory] [c]ap to the statutory cause of action of wrongful death because, among other reasons, such causes of actions are not traditional tort actions for personal injury."

The *Streidel* Court said:

The language of the cap statute refers only to damages awarded in an action for "personal injury," § 11–108(b). The term "personal injury" or "injury" normally connotes a physical injury to a victim. The death of a victim as a result of a "personal injury" or "injury" is, of course, the ultimate injury to that victim. The damages recoverable by the

victim's estate in a survival action, for a "personal injury" resulting in death, are, however, distinct from the damages recoverable by the family of that victim under the Wrongful Death Act, § 3–901 *et seq.* of the Courts and Judicial Proceedings Article. The damages which the victim's family are entitled to recover under the Wrongful Death Act are for the value, pecuniary or otherwise, of the life of the deceased to the persons entitled to recover. This recovery for "death" under the wrongful death act does not compensate for the "personal injury" to the direct victim of the tortious conduct. Thus, ordinarily, unless the context indicates otherwise, damages for an "injury" or a "personal injury" or a "bodily injury" do not include those damages recoverable in a wrongful death action.

329 Md. at 539–40, 620 A.2d 905 (footnotes omitted).

The *Streidel* Court never used the phrase "traditional tort action for personal injury" in its analysis and nothing said in *Streidel* supports appellant's position that one of the reasons that the cap statute was deemed inapplicable to a wrongful death action was because such actions were not "traditional tort action[s]." The crux of the *Streidel* decision was that wrongful death statute cases were not governed by the cap statute because such suits did not assert a claim for personal injury. *Id.* at 539–44, 620 A.2d 905.

In *Streidel* the Court quoted, in full, the cap statute as it existed in 1993. *See id.* at 537–39, 620 A.2d 905. At the time *Streidel* was decided, the language of the cap statute clearly indicated that the statute applied to *all* personal injury actions in Maryland where non-economic damages were prayed. *See Kent Village Assocs. Joint Venture v. Smith,* 104 Md.App. 507, 657 A.2d 330 (1995), a case in which the trial court applied the cap statute (before it was amended in 1994) to a cause of action alleging negligence and a violation of the Federal Consumer Product Safety Act. In *Kent Village,* Chief Judge Wilner, speaking for this Court, said:

We do not regard the statutory "cap" on non-economic damages—$350,000 in this case, later increased by the

General Assembly to $500,000—to so impede the Federal right as to frustrate the Congressional intent. *It is a limit that is applicable now to all personal injury actions in Maryland and thus is uniform in its application;* it is the kind of limit that is not uncommon among States; it applies to only one category of damage—the category least quantifiable on an objective basis and most subject to inflation through jury passion or sympathy; and it is set high enough to compensate most injured victims for the pain or disfigurement they may suffer. We therefore find no error in the court's reduction of the verdict.

*Id.* at 532, 657 A.2d 330 (emphasis added).

As shown by what we have said *supra,* if a plaintiff had a cause of action for personal injury that arose between July 1, 1986, and the date the cap statute was amended (effective Oct. 1, 1994), that action, including actions for injury caused by a violation of the CPA, would have been covered by the cap statute.

The cap statute was amended when the General Assembly passed Senate Bill 283, 1994 Laws of Maryland. The purpose of the bill was expressed as follows:

[For the purpose] of providing the limitation on an award for noneconomic damages applies [sic] in a wrongful death action *in which the cause of action arises on or after a certain date;* providing for the application of the limitation on an award for noneconomic damages in a personal injury or wrongful death action to certain persons and actions; increasing the limitation on an award for noneconomic damages in certain causes of action arising on or after a certain date; providing for an annual increase in the limitation on an award for noneconomic damages; *establishing a certain limitation on an award for noneconomic damages in which there is a certain number of claimants or beneficiaries; providing for the reduction of an award in certain wrongful death actions under certain circumstances;* defining the term "noneconomic damages" for purposes of applying the limitation on an award for noneconomic damages in a

wrongful death action; ~~providing for the effective date of certain provisions of this Act;~~ providing for the construction and application of certain provisions of this Act; and generally relating to the limitation on an award for noneconomic damages in certain actions.

(Emphasis added.)

█ The amendment made three substantive changes to sections 11–108 and 11–109 of the Courts and Judicial Proceedings Article: 1) it reversed the Court of Appeal's decision in *Streidel* by declaring non-economic damages in wrongful death suits subject to the cap 2) it overruled the decision in *Bartucco v. Wright*, 746 F.Supp. 604, 612 (D.Md.1990)[4] and applied the cap collectively to all plaintiffs who claimed injury through the tort victim; and 3) raised the existing cap for noneconomic damages suffered in personal injury cases from $350,000 to $500,000 and provided an annual $15,000 upward adjustment to this limit for both personal injury and wrongful death suits. *See* Diana M. Schobel, *The Application of the Cap on Noneconomic Damages to Wrongful Death Actions*, 54 Md. L.Rev. 914 (1995) (hereinafter "Schobel").

It is well established that "[t]he cardinal rule of statutory construction is to ascertain and effectuate the intent of the Legislature." *Stoddard v. State*, 395 Md. 653, 661, 911 A.2d 1245 ... (2006); *Chow v. State*, 393 Md. 431, 443, 903 A.2d

---

**4.** In *Bartucco*, the United States District Court for the District of Maryland was faced with the issue of whether section 11–108 applied individually to each wrongful death plaintiff or to the class as a whole. In resolving this issue, the Court focused, *inter alia*, on textual considerations. The Court noted that "if all plaintiffs were subject to a single cap, the two statutes [i.e., the wrongful death statute and the damages cap statute] would contain conflicting provisions regarding the role of a jury in a wrongful death action." 746 F.Supp. at 608. This is so because the wrongful death statute required that the amount recovered was to be divided among the beneficiaries in shares directed by the verdict, yet the cap statute stated that the jury was not to be informed of the damages cap limitations. Due in part to "the absence of statutory guidance as to the manner in which to reduce multiple awards which, in total, exceed a single damages cap", the Court held that "the Maryland cap on nonpecuniary damages should be applied individually to each wrongful death plaintiff, rather than to the class as a whole." *Id.* at 612.

388 (2006); *Collins v. State*, 383 Md. 684, 688, 861 A.2d 727 (2004). We begin our analysis by first looking to the normal, plain meaning of the language of the statute so that "no word, clause, sentence or phrase is rendered superfluous or nugatory." *Chow*, 393 Md. at 443, 903 A.2d 388; *Collins*, 383 Md. at 688–91, 861 A.2d 727. Further, whenever possible, an interpretation should be given to the statutory provisions which does not lead to unreasonable or illogical consequences. *Stoddard v. State*, 395 Md. 653, 663, 911 A.2d 1245 (2006); *Blake v. State*, 395 Md. 213, 224, 909 A.2d 1020 (2006). If the language of the statute is clear and unambiguous, we need not look beyond the statute's provisions and our analysis ends. *Stoddard*, 395 Md. at 661, 911 A.2d 1245; *Chow*, 393 Md. at 443, 903 A.2d 388; *Collins*, 383 Md. at 689, 861 A.2d 727. If, however, the language is subject to more than one interpretation, it is ambiguous, and we resolve that ambiguity by looking to the statute's legislative history, case law, and statutory purpose. *Stoddard*, 395 Md. at 662–63, 911 A.2d 1245; *Blake*, 395 Md. at 224, 909 A.2d 1020; *Chow*, 393 Md. at 444, 903 A.2d 388; *Collins*, 383 Md. at 691–92, 861 A.2d 727.

*Rush v. State*, 403 Md. 68, 97–98, 939 A.2d 689 (2008).

When the cap statute was originally enacted one of the General Assembly's primary goals was "to promote the availability and affordability of liability insurance in Maryland." *Oaks v. Connors*, 339 Md. 24, 34–35, 660 A.2d 423 (1995) (citations omitted). The Court of Appeals in *Murphy v. Edmonds*, 325 Md. 342, 601 A.2d 102 (1992), further explained the original purpose as follows:

Section 11–108 was enacted in response to a legislatively perceived crisis concerning the availability and cost of liability insurance in this State. This crisis resulted in the unavailability of liability insurance for some individuals and entities, especially those engaged in hazardous activities such as asbestos removal, and increasing difficulty in obtaining reinsurance. *See Report of the Governor's Task Force to Study Liability Insurance*, 3–4 (Dec.1985). The crisis also affected the medical profession, resulting in excessive

insurance premiums for doctors and declining services for patients, especially in high risk specialties such as obstetrics. *See Report of the Joint Executive/Legislative Task Force on Medical Malpractice Insurance,* 5 (Dec.1985). *Id.* at 368, 601 A.2d 102 (footnote omitted).

Both businesses and individuals need insurance for economic protection against suits seeking non-economic damages regardless of whether the lawsuits are based on acts of commission or omission that were torts at common law or are based on conduct that breaches a duty imposed by a statute or by constitution. With that in mind, we turn to the pertinent legislative history behind the 1994 amendment to the cap statute, which was accurately summarized by Schobel as follows:

One year after *Murphy* [*v. Edmonds,* 325 Md. 342, 601 A.2d 102 (1992)] came the *Streidel* decision, which disturbed the settled statutory interpretation that the General Assembly intended the cap to apply to wrongful death cases. The *Streidel* Court examined the statute's requirement that juries itemize awards for "personal injury" actions in order to indicate how much they have allocated for past and future lost earnings, medical expenses, noneconomic damages, and other damages, and pointed out that such categories of damages do not apply to recoveries in wrongful death actions. The court found, moreover, nothing in the available legislative history that indicated the cap on noneconomic damages would apply to wrongful death cases. *Given this finding, the court saw no need to reach the question certified before it: whether the damage cap would apply individually or in the aggregate to plaintiffs in the wrongful death action.*

b. Legislative and Political History.—The legislative proposal to reverse *Streidel* was assigned to the Senate Judicial Proceedings Committee, chaired by the Bill's sponsor, Senator Walter Baker (D–Cecil). A member of the conference committee that formulated the 1986 cap, Senator Baker believed that, contrary to *Streidel's* analysis, the legislature always intended the damage ceiling to cover wrongful death

actions. This belief reflected the fear of many legislators and insurers that medical malpractice rates, presumably stabilized by the 1986 cap, would soar in the face of wrongful death damage awards no longer restrained by law.

Insurance industry representatives joined forces with the state's medical community to support the legislation. One insurance company cited a Baltimore County case, in which a plaintiff received nearly $6,000,000 in noneconomic damages, in order to show the danger of leaving the jury to its own devices. Moreover, malpractice rates that had doubled in Maryland between 1984 and 1987 remained essentially constant from 1988 to 1993, at least in part, because of the cap.

Despite a proposed raise in the statutory ceiling from $350,000 to $450,000 and an allowance for yearly increases for inflation, victims' rights groups and the plaintiffs [sic] bar objected. They denied any correlation between caps on noneconomic damages and medical malpractice premiums while insisting insurers were simply trying to protect their substantial profit margins.

The proposed legislation emerged from the Senate Committee by the slimmest of margins. In addition to the primary issue of whether to extend the cap to cover wrongful death, the Judicial Proceedings Committee wrestled with the Bill's retroactive application to wrongful death suits still pending. Proponents of retroactivity argued that until *Streidel,* insurance rates were set with the assumption that wrongful death was already included by law. Premiums had been collected to reflect the presence of the cap, and would have to be increased immediately to cover possible noneconomic awards exceeding the old cap. Although the Attorney General advised that there was no constitutional bar to the retroactivity provision, the Committee ultimately opted to amend the legislation to apply only to causes of action arising after October 1, 1994.

*The Bill required application of the cap amount to the tort victim and "all persons who claim injury by or through that victim," thus answering the question that was never*

*addressed by the Streidel Court.* The Senate Committee agreed to increase the limit in wrongful death actions to 150% of the proposed limit when two or more claimants existed, but retained a single cap for all plaintiffs in a personal injury claim.

This proposed legislation was referred to a conference committee after the House re-inserted a retroactivity provision in its version of the Bill that applied to wrongful death actions still pending after October 1, 1994. The House also increased the limit for multiple claimants to 200% of the statutory ceiling and raised the damage ceiling itself to $500,000. For personal injury cases, it sought to apply the cap to each plaintiff, whereas the Senate's version imposed the limit on all claimants. In conference, the Senate conceded the $500,000 ceiling, but prevailed on all other points. The revised bill passed in both chambers by wide margins.

54 Md. L.Rev. at 917–19 (footnotes omitted) (emphasis added).

The amended statute, as already mentioned, contains the new language in Section 11–108(b)(3)(i), upon which appellant relies, i.e., "the limitation established under paragraph (2) of this subsection shall apply in a personal injury action to each direct victim of *tortious conduct* and all persons who claim injury by or through that victim." (Emphasis added).

It is clear to us that the legislature added the language, upon which appellant relies, in order to answer the question that the *Streidel* Court had left unanswered, i.e., to make it clear that cap amounts are applied to the tort victim and all persons who claim injury by or through that victim in a personal injury or a wrongful death action.[5]

We do not believe that the legislature, when it amended the cap statute, intended to expand the statute to cover wrongful death actions but at the same time intended to narrow its application so that rather than applying "to all actions for

---

**5.** When two or more persons claim non-economic damages in a wrongful death action, one cap applies to all claimants, although the cap amount is increased by 150%. *See* 11–108(b)(3)(ii).

personal injuries," as it did before the amendment (*Kent Village*, 104 Md.App. at 532, 657 A.2d 330), it was now to cover wrongful death actions and all actions for personal injury so long as the victims were injured as the result of common law torts. One reason for reaching this conclusion, aside from the ones already discussed, is the fact that nothing in the rather extensive legislative history surrounding the enactment in 1994 of Senate Bill 283 gives *any* indication that the General Assembly wanted to narrow the scope of the cap statute in any respect. More specifically, nothing in the legislative history suggests that the General Assembly even thought of the difference between actions claiming personal injury due to common law torts as opposed to causes of action claiming personal injury arising out of statutory or constitutional torts. And, when interpreting a statute, a court must presume that the legislature did not intend to make any alteration other than what is specified and plainly pronounced. *N. Cent. Ry. Co. v. Green*, 112 Md. 487, 76 A. 90 (1910). Also, in light of the reasons for the original cap statute, and its amendment, it is impossible to believe that the legislature intended to narrow the statute in the way appellant suggests so that insurers would now have to cover non-economic damages awards that exceeded the cap so long as the personal injury action arose out of the violation of a statute or a constitutional provision.

For all the above reasons, we hold that the circuit court was correct when it ruled that the cap statute applied to appellant's claim for damages that arose, in part, out of a violation of the CPA.[6]

---

**6.** In actions brought by the Division of Consumer Protection of the Office of the Attorney General violators of the CPA may be subject to "injunctions, cease and desist orders, restitution, and civil penalties," *Morris v. Osmose Wood Preserving*, 340 Md. 519, 538, 667 A.2d 624 (1995), regardless of whether a consumer has suffered any harm. *See* Md. Com. Law § 13–302 ("Any practice prohibited by this title is a violation of this title, whether or not any consumer in fact has been misled, deceived, or damaged as a result of that practice."). Such claims *are not* covered by the cap statute because when the Division brings an action it does not seek recovery for "personal injury."

## IV.

Appellant argues that even if the statutory cap does apply to actions brought under the CPA, the statutory cap is unconstitutional because it constitutes a "special law" that is barred by Article III, section 33 of the Maryland Constitution. This same argument was considered and rejected by this Court in *Univ. of Maryland Med. Sys. Corp. v. Malory*, 143 Md.App. 327, 795 A.2d 107 (2001). No useful purpose would be served by reiterating what was so well said in *Malory*, 143 Md.App. at 352–54, 795 A.2d 107. *See also Kent Village*, 104 Md.App. at 532, 657 A.2d 330 ("[The statutory cap] is a limit that is applicable now to all personal injury actions in Maryland and thus is uniform in its application ... it applies to only one category of damage-the category least quantifiable on an objective basis and most subject to inflation through jury passion or sympathy; and it is set high enough to compensate most injured victims for the pain or disfigurement they may suffer.").

## V.

Lastly, appellant argues that even if the statutory cap applies and is upheld as constitutional, "the applicable [c]ap in this case is $530,000.00, not $515,000.00 as determined by the trial court ... because [a]ppellant has a cause of action against [a]ppellees which 'arose' after the [c]ap was increased from $515,000.00 to $530,000.00."

Both parties agree that if Kelly's cause of action "arose" between Oct. 1, 1995 and Oct. 1, 1996, the non-economic damages cap is $515,000.00. They also agree that if Kelly's cause of action "arose" between Oct. 1, 1996 and Oct. 1, 1997, then the "cap" should be $530,000.00.

Appellees contend that the cause of action arose on November 15, 1995, when Kelly was first diagnosed with having excessive lead levels in her blood. Appellant responds in four parts: 1) appellees had a continuing duty to Kelly to keep the rented premises free from flaking, loose or peeling lead paint (*Brooks v. Lewin Realty III, Inc.*, 378 Md. 70, 83–84, 835 A.2d

616 (2003); 2) because appellees breached a continuing duty, "a new or separate, cause of action arises" each time the plaintiff is injured; 3) although Kelly was injured by lead paint poisoning before October 1, 1996, she endured further injury between October 1, 1996 and September 13, 1997, when she vacated the leased premises; 4) therefore, because some of the breaches of duty by appellees and some of Kelly's injuries occurred after October 1, 1996, the higher cap ($530,-000.00) should apply. At oral argument before us, appellant's counsel admitted that it was impossible to separate the injuries suffered before October 1, 1995, and those suffered after that date. Nevertheless, appellant argues that it "is of no consequence that (Kelly) also has a cause of action for injuries which occurred prior (to October 1, 1996)."

■ The trial judge was correct in rejecting the above argument. Even if it is true that appellant had a "new or separate cause of action" that "arose" every time she was injured, she did not bring a series of causes of action. She brought a single cause of action for all her injuries. "A cause of action arises within the meaning of C.J. § 11–108 'when facts exist to support each element' of the cause of action." *Berg v. Byrd,* 124 Md.App. 208, 216, 720 A.2d 1283 (1998) (quoting *Owens–Illinois v. Armstrong,* 326 Md. 107, 121, 604 A.2d 47 (1992)). Appellant's claim for negligence arose within the meaning of section 11–108 once she sustained a legally cognizable injury. *Id.* (citation omitted). The same holds true for appellant's cause of action for appellees' CPA violation; i.e., a cause of action arose once appellant sustained injury resulting from the violation. *Id.*

■ Kelly had a legally cognizable injury on November 15, 1995–the date she was first diagnosed with an excessive lead level. The November 15, 1995, lead level was 9 mg/dl. Dr. Rosen testified that although the November 15, 1995, lead level measured at less than 10 mg/dl, Kelly was still harmed as of that date. We therefore conclude that the complaint appellant filed, and the cause of action to which the cap statute was

applied, arose after October 1, 1995, but before October 1, 1996.[7]

**JUDGMENT AFFIRMED; COSTS TO BE PAID BY APPELLANT.**

---

7. At trial appellant made no attempt to show what drop in IQ occurred, if any, due to lead paint poisoning after October 1, 1996. Appellant simply proved the lead levels at various dates and Dr. Rosen provided expert testimony as to the overall loss.