*Joseph Watts v. Prince George's County, Maryland*, No. 194, Sept. Term, 2024. Opinion filed on October 29, 2025, by Wells, C.J.

**CIVIL LAW – LOCAL GOVERNMENT TORT CLAIMS ACT – DAMAGES**

Under the Local Government Tort Claims Act, a local government "shall be liable for any judgment against its employee for damages resulting from tortious acts or omissions committed by the employee within the scope of employment with the local government." The act also places a limit on liability for the amount of damages a plaintiff can recover at $400,000 per individual claim and $800,000 per total claims that arise from the same occurrence for damages resulting from tortious acts or omissions. Although the act does not define "tortious acts or omissions," the Supreme Court of Maryland has previously explained that the definitions should not be interpreted so broadly as to extend to all civil wrongs under Maryland law, although they are not necessarily limited only to common law torts.

There is no evidence that the General Assembly intended "tortious acts or omissions" to include discrimination and retaliation damages under the Maryland Fair Employment Practices Act. In this case, Watts filed claims under the Maryland Fair Employment Practices Act and the Prince George's County Code, and the jury awarded him damages of $1.7 million. The act does not apply to Watts' verdict for damages.

REPORTED

IN THE APPELLATE COURT

OF MARYLAND

No. 194

September Term, 2024

_____

JOSEPH WATTS

v.

PRINCE GEORGE'S COUNTY,
MARYLAND

_____

Wells, C.J.,
Berger,
Eyler, James R.
  (Senior Judge, Specially Assigned),

JJ.

_____
_____

Opinion by Wells, C.J.

_____

Filed: October 29, 2025

Pursuant to the Maryland Uniform Electronic Legal
Materials Act (§§ 10-1601 et seq. of the State
Government Article) this document is authentic.



Gregory Hilton, Clerk

In this case, a jury in the Circuit Court for Prince George's County awarded $1.7 million to appellant Lt. Joseph Watts, a former correctional officer at the Prince George's County Department of Corrections ("DOC"), for employment discrimination and retaliation claims under the Maryland Fair Employment Practices Act and Prince George's County Code that Watts filed against appellee Prince George's County (the "County"). The County filed a subsequent motion for remittitur, and the circuit court ordered the verdict be reduced to $400,000 pursuant to a damages cap in the Local Government Tort Claims Act (hereinafter, "Local Government TCA"). Watts, supported by an amicus brief from the Metropolitan Washington Employment Lawyers Association, filed a timely appeal and presents one question for our review, which we slightly rephrase:

> Did the circuit court err in applying the damages cap of the [Local Government TCA] to the jury's verdict on [Watts]' claims of employment discrimination and retaliation?

For the reasons set forth below, we conclude the damages cap in the Local Government TCA on "tortious acts or omissions" does not apply to Watts' verdict for employment discrimination and retaliation damages under the Maryland Fair Employment Practices Act and Prince George's County Code. We reverse the decision of the circuit court and remand for further proceedings consistent with this opinion.

## FACTUAL AND PROCEDURAL BACKGROUND

Watts was employed by the Prince George's County DOC for over 15 years. In October 2017, Watts suffered an infection in his foot, which was made worse by complications from diabetes and eventually required a below-the-knee amputation. The DOC subsequently placed Watts on medical leave. Watts' doctor cleared him to return to

work on full-duty status in March 2018 with the aid of a prosthetic leg. Just days before

Watts' return to duty, he was promoted to the rank of lieutenant. As a lieutenant, his work

duties were mostly ministerial, although he was required to conduct walk-throughs of jail

cells to monitor inmates and possible emergency situations, which he was able to perform.

In the following months, the DOC refused to place Watts on full-duty status until

he completed a physical agility test. Watts took the physical agility test in May 2018.[1]

Meanwhile, Watts provided evidence at trial that he was able to fully perform his job duties

as lieutenant while working light duty. Watts was informed he failed the physical agility

test and was deemed not fit for full duty by the DOC. Watts then proposed reasonable

accommodations to the DOC, which were not accepted. The DOC instead continued to

require he pass the physical agility test before allowing him to return to full duty. Watts

initially agreed to undergo another physical agility test in January 2019; however, he did

not proceed with the test after learning, contrary to his initial agreement with the DOC, that

---

[1] At trial, Watts produced evidence and testimony that numerous aspects of the physical agility test were abnormal. According to testimony from other correctional officers at the trial, the physical agility test was typically only given to new "recruits," and no fully employed correctional officer was ever previously required to take the physical agility test after they were hired for any reason, including transitioning from light to full duty. Watts testified he was told he would be taking the physical agility test three days before it was administered and was given a guide describing the test two days before it was administered, whereas new recruits were typically provided the guide describing the physical test events two to three weeks before the test. Additionally, the DOC policy for administering the physical agility test instructed that if someone failed one of the eight events, they would not proceed to the next event in the test. However, Watts completed all eight events, despite allegedly missing the time cutoff for seven of the eight events. Watts also was not provided the results of his test until six weeks later, whereas new recruits were usually told their results immediately.

it would not be administered by a third-party agency at a non-DOC location. On February 15, 2019, Watts was placed on leave and provided a notice that his employment was being terminated because of his disability. Watts appealed his termination to the Prince George's County Personnel Board, which offered a disability retirement as settlement. Watts accepted the disability retirement settlement to mitigate his damages and maintain his insurance.[2] At trial, Watts' wife and experts testified to Watts' economic and emotional losses from his termination.

Watts filed an amended complaint against the County in the Circuit Court for Prince George's County, asserting one count each of employment disability discrimination and retaliation under the Maryland Fair Employment Practices Act, Maryland Code §§ 20-606(a), (f) of the State Government Article ("SG"),[3] and one count of employment discrimination under Prince George's County Code ("PGCC") § 2-222.[4] A five-day jury

---

[2] The County, DOC, and Watts also agreed the settlement only applied to Watts' appeal before the Personnel Board and did not affect any other case, including the present one.

[3] Subtitle 6 of the Maryland Fair Employment Practices Act addresses employment discrimination and makes it illegal for an employer to "discharge, or otherwise discriminate against any individual with respect to the individual's compensation, terms, conditions, or privileges of employment because of: (i) the individual's . . . disability unrelated in nature and extent so as to reasonably preclude the performance of the employment." SG § 20-606(a)(1). Additionally, an "employer may not discriminate or retaliate against any of its employees . . . because the individual has: (1) opposed any practice prohibited by this subtitle; or (2) made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subtitle." SG § 20-606(f).

[4] SG § 20-1202(b) states "a person that is subjected to a discriminatory act prohibited by the county code may bring and maintain a civil action against the person that committed the alleged discriminatory act for damages, injunctive relief, or other civil

trial was held from May 8 to 15, 2023, and the jury found in favor of Watts on all three counts. For Watts' disability discrimination claims, the jury awarded him $255,681 for "back pay," $240,528 for "Future Monetary Losses," and $601,895.50 for "Other Damages." For Watts' retaliation claims, the jury awarded him $601,895.50 for "Other Damages." Watts' total award was $1,700,000.

On May 30, 2023, the County filed a motion for judgment notwithstanding the verdict, or in the alternative, motion for remittitur, and motion for a new trial. On February 27, 2024, the circuit court granted the County's motion in part and ordered the verdict be reduced to $400,000 pursuant to the damages cap in the Local Government TCA, Maryland Code, § 5-301 *et seq.* of the Courts & Judicial Proceedings Article ("CJP").[5] Watts filed a timely appeal on March 28, 2024. The Metropolitan Washington Employment Lawyers Association filed an amicus brief in support of Watts and reversal of the circuit court's decision.

---

relief." An action must be brought within two years after the alleged discriminatory act. SG § 20-1202(c)(1). Pursuant to SG § 20-1202, the PGCC's anti-discrimination statute states: "No employer in the County shall discharge or refuse to hire any person, or act against any person with respect to compensation or other terms and conditions of employment, or limit, segregate, classify, or assign employees because of discrimination." PGCC § 2-222. An "employer" includes "the Prince George's County Government." PGCC § 2-186(a)(8). Discrimination means "acting, or failing to act, or unduly delaying any action regarding any person because of . . . disability . . . in such a way that such person is adversely affected in the areas of . . . employment . . . ." PGCC § 2-186(a)(6).

[5] Watts filed a motion for reconsideration with the circuit court, which the court denied on July 27, 2024.

4

**STANDARD OF REVIEW**

A trial court's decision to reduce a jury verdict based on the court's application of a statute, rather than the court's evaluation of the verdict in relation to the evidence, is a conclusion of law that appellate courts review *de novo*. *Rodriguez v. Cooper*, 458 Md. 425, 437 (2018). Therefore, we review questions related to the applicability of the Local Government TCA's damages cap on statutory discrimination and retaliation claims without deference.

**DISCUSSION**

I. **The Damages Cap in the Local Government TCA Does Not Apply to Watts' Jury Verdict for Employment Discrimination and Retaliation Claims.**

    A. **Parties' Contentions**

Watts contends the Maryland Fair Employment Practices Act and Prince George's County Code allow a plaintiff to recover full damages, and the Local Government TCA does not apply to his verdict for three reasons. Watts first argues PGCC § 2-200[6] and its enabling statute, Md. Code, SG § 20-1202, do not contain a cap on damages, and the legislative history of Md. Code, SG § 20-1202 shows the General Assembly never intended to limit damages for statutory causes of action like discrimination and retaliation.

---

[6] PGCC § 2-200 states in relevant part: "Any person who is aggrieved by any act prohibited in this Division may bring an appropriate action in law or equity in the Circuit Court to seek damages, redress of injury, or injunctive relief arising out of any such prohibited act, in addition to pursuing the procedures and seeking the remedies established in this Division."

Second, Watts argues state statutory claims are not "tortious acts or omissions" under the Local Government TCA. Watts supports this argument by discussing case law that defined "tort action" in the Maryland Tort Claims Act (hereinafter, "Maryland TCA"), SG §§ 12-101 *et seq.*, which has been previously referenced by the Supreme Court to interpret the Local Government TCA, to assert that "the phrase 'tortious acts or omissions' in the Local Government TCA does not encompass all statutory causes of action." Further, Watts asserts that if discrimination was a tortious act or omission, then a victim of discrimination could sue in tort, but there is no common law tort claim for employment discrimination. Watts also points to a decision from the United States District Court for the District of Maryland and other federal and state cases that held discrimination was a statutory cause of action, not a common law tort.

Third, Watts argues the purpose of the Local Government TCA is to require local governments to defend and indemnify individual employees who are sued for "tortious acts or omissions" committed within the scope of their employment, and the Maryland Fair Employment Practices Act only allows suits against employers; therefore, the Local Government TCA's indemnifying purpose does not apply to the Maryland Fair Employment Practices Act. Additionally, Watts avers the Local Government TCA's other purpose is to provide a tradeoff for the State's waiver of sovereign immunity by capping damages, but that purpose is not served here because the Maryland Fair Employment Practices Act and PGCC § 2-222 directly waived sovereign immunity. In Watts' reply brief, he further acknowledges the Local Government TCA was also passed as a result of increasing third-party tort claims and high insurance premiums for local governments.

6

However, Watts argues this does not show the damages cap applied to statutory claims because the damages cap was meant to provide the Legislature with some sort of control and stability over damages for liability insurance purposes in exchange for the immunity waiver. Therefore, Watts claims, the damages cap applies to damages arising from common and constitutional law claims, but "the claims and remedies [for statutory claims] are entirely creations of the legislature and are within its control."

The County first responds that PGCC § 2-220 does not expressly allow plaintiffs to recover full damages and is silent on the issue of a damages cap. On the Local Government TCA's purpose, the County relies on *Espina v. Jackson*, 442 Md. 311 (2015), to argue the Local Government TCA was meant to cap liability for local governments on a wide range of "civil wrongs" including statutory claims, to provide predictability and stability for obtaining insurance, and the Legislature did not provide exceptions for any types of claims, including those created by statutes.

Next, the County agrees with Watts that Maryland appellate courts have not held "tortious acts or omissions" under the Local Government TCA to include employment discrimination or retaliation claims but points out that the opposite is true as well: neither the "Supreme Court nor this Court has ever held that statutory employment claims were not 'tortious acts or omissions.'" In the absence of a holding on whether discrimination claims are tortious acts or omissions under the Local Government TCA, the County says, we must look to the intent of the General Assembly, which they claim was to "apply to all claims for damages against a local government."

7

The County also argues that the Supreme Court's definition of "tort" and "tortious" in *Espina* broadly included all civil wrongs that provided a remedy—usually damages—for a breach of duty imposed under the law. The County contends this definition from *Espina* covers statutory discrimination claims in this lawsuit, therefore the Local Government TCA's damages cap applies to Watts' award.

## B. Analysis

The Maryland Fair Employment Practices Act and Prince George's County Code are silent on limiting damages awarded for Watts' employment discrimination and retaliation claims. Watts directs us to the text and legislative history of the Maryland Fair Employment Practices Act and Prince George's County Code to support this fact and argues "there was never any intent by the General Assembly or the Prince George's County Council to limit [Watts'] damages." We do not read the legislature's silence on damage caps in the Maryland Fair Employment Practices Act and Prince George's County Code to preclude the possibility that the General Assembly intended the Local Government TCA's damages cap to apply to Watts' award under those statutes. *See Espina*, 442 Md. at 322 ("We neither add nor delete language so as to reflect an intent not evidenced in the plain and unambiguous language of the statute . . . ."). We must instead determine whether the term "tortious acts or omissions" in the Local Government TCA includes statutory employment discrimination and retaliation claims under the Maryland Fair Employment Practices Act and Prince George's County Code, and therefore, whether the Local Government TCA caps the damages award Watts received at trial. In doing so, we must interpret the Local Government TCA.

"We have long held that the cardinal rule of statutory interpretation is to ascertain and effectuate the intent of the Legislature. Our primary goal is to discern the legislative purpose, the ends to be accomplished, or the evils to be remedied by the statutory provision." *Id.* at 321 (internal citation and quotation marks omitted) (cleaned up).

> We begin with the normal, plain meaning of the language of the statute. If the language of the statute is unambiguous and clearly consistent with the statute's apparent purpose, our inquiry as to legislative intent ends ordinarily and we apply the statute as written, without resort to other rules of construction. We neither add nor delete language so as to reflect an intent not evidenced in the plain and unambiguous language of the statute . . . . We, however, do not read statutory language in a vacuum, nor do we confine strictly our interpretation of a statute's plain language to the isolated section alone. Rather, the plain language must be viewed within the context of the statutory scheme to which it belongs, considering the purpose, aim, or policy of the Legislature in enacting the statute . . . .

> Where the words of a statute are ambiguous and subject to more than one reasonable interpretation, or where the words are clear and unambiguous when viewed in isolation, but become ambiguous when read as part of a larger statutory scheme, a court must resolve the ambiguity by searching for legislative intent in other indicia, including the history of the legislation or other relevant sources intrinsic and extrinsic to the legislative process. In resolving ambiguities, a court considers the structure of the statute, how it relates to other laws, its general purpose, and the relative rationality and legal effect of various competing constructions.

> In every case, the statute must be given a reasonable interpretation, not one that is absurd, illogical, or incompatible with common sense.

*Id.* at 322 (quoting *Bd. of Cnty. Comm'rs of St. Mary's Cnty. v. Marcas, L.L.C.*, 415 Md. 676, 685–86 (2010)).

The Local Government TCA states "a local government shall be liable for any judgment against its employee for damages resulting from tortious acts or omissions committed by the employee within the scope of employment with the local government."

9

CJP § 5-303(b)(1). While this provision waived sovereign immunity of local governments for "tortious actions or omissions," the Local Government TCA also placed a "cap" or "limit on liability" on the amount of monetary damages a plaintiff can receive, stating: "the liability of a local government may not exceed $400,000 per an individual claim, and $800,000 per total claims that arise from the same occurrence for damages resulting from tortious acts or omissions . . . ." Plaintiffs must also comply with the Local Government TCA's notice requirement and, among other things, provide the local government "notice of the claim . . . within 1 year after the injury" before seeking "an action for unliquidated damages[.]" CJP § 5-304(b)(1).

The Local Government TCA does not define "tortious acts or omissions." At the very least, the term was always understood to encompass actions for torts available at common law. In *Espina*, the Supreme Court of Maryland held that claims under Article 24 of the Maryland Declaration of Rights[7] were also subject to the Local Government TCA damages cap because constitutional claims were included under "tortious acts or omissions." 442 Md. at 324. In defining the scope of the term "tortious acts or omissions," the Court looked to its prior decisions in *Lee v. Cline*, 384 Md. 245 (2004), in which the

---

[7] The Court in *Espina* explicitly stated "our decision does not imply that *all* constitutional violations fall under the purview of the [Local Government TCA]," and explained, without deciding, that the Local Government TCA would not cap damages under the "takings" clause of the Maryland Constitution, Art. III, § 40, because it would be contrary to case law and "could conflict with a vested right to just compensation." 442 Md. at 332–33 (emphasis in original) (citations omitted).

Court held "tort action" in the Maryland TCA[8] "cover[ed] intentional torts and constitutional torts[,]" and *Green v. N.B.S., Inc.*, 409 Md. 528 (2009), in which the Court held violations of the Maryland Consumer Protection Act were "torts" and "tortious conduct" subject to the General Assembly's general cap for non-economic damages arising out of any personal injury actions in CJP § 11-108.[9] *Espina*, 442 Md. at 324–25. *Espina*, quoting and discussing *Green*'s analysis of whether torts in the Maryland Consumer Protection Act were included under "personal injuries" in CJP § 11-108, considered Black's Law Dictionary definition of "tort" and "tortious":

> "Tortious" is defined as "[c]onstituting a tort; wrongful." Black's Law Dictionary 1497 (7th ed. 1999). A "tort" is defined as "[a] civil wrong for which a remedy may be obtained, usually in the form of damages; a breach

---

[8] The Maryland TCA waived the State of Maryland's sovereign immunity for "tort action[s]" and limited the amount of damages a plaintiff can receive depending on the type of tort claim. SG § 12-104(a). Like the Local Government TCA, the Maryland TCA contains a provision requiring a plaintiff to provide notice before instituting a tort action. SG § 12-106(b). Also similar to the Local Government TCA, the General Assembly did not define "tort action" under the Maryland TCA. When defining "tortious acts or omissions" in the Local Government TCA, Maryland courts consider previous cases defining "tort action" in the Maryland TCA, and vice versa, as Maryland courts understand the two terms to refer to the same conduct. *See, e.g.*, *Williams*, 484 Md. at 549 (distinguishing *Espina*'s discussion of case law defining tortious acts or omissions under the Local Government TCA when interpreting the Maryland TCA); *Espina*, 442 Md. at 324 (considering *Lee*'s discussion of the scope of "tort claims" extending to constitutional claims in the Maryland TCA to define the scope of "tortious acts or omissions" extending to constitutional claims in the Local Government TCA); *cf. State v. Young*, 265 Md. App. 1, 38 (2025) (comparing the definition of "single occurrence" in the Local Government TCA, "which is substantially similar to the [Maryland TCA]," to define the scope of the same term in the Maryland TCA). "The language of the [Local Government TCA] is patterned generally after the [Maryland TCA] . . . ." *Espina*, 442 Md. at 328 (internal citation and quotation marks omitted). Indeed, the Maryland TCA even uses both phrases. SG § 12-104(a)(2)(ii) ("If liability of the State or its units arises from intentional tortious acts or omissions . . . .").

[9] CJP § 11-108 caps the amount of noneconomic damages a plaintiff can receive "in any action for damages for personal injury . . . ."

11

of a duty that the law imposes on everyone in the same relation to one another as those involved in a given transaction." *Id.* at 1496. **Therefore, the term "tort" as defined by Black's encompasses all "civil wrongs," not just wrongs that were recognized as a civil wrong at common law.**

*Id.* at 325 (emphasis in original) (quoting *Green*, 409 Md. at 542). *Espina* further observed its decisions in *Green* and *Lee* "at least suggest[] that the term 'tortious conduct' includes more than conduct that constituted a tort at common law" and further noted "nothing in the legislative history [of the Local Government TCA] suggests that the General Assembly even thought of the difference between actions claiming personal injury due to common law torts as opposed to causes of action claiming personal injury arising out of statutory or constitutional torts." *Id.* at 325 (quoting *Green*, 409 Md. at 542, 544). Additionally, in *Espina* the Supreme Court noted that in its analysis, previous cases referred to constitutional violations as "constitutional torts." *Id.* at 325–26.

Our Supreme Court in *Espina* also found the lack of exceptions in the Local Government TCA for constitutional torts, or "any category of torts[,]" was further evidence that the Local Government TCA cap applied to constitutional claims because

> [t]his Court has been most reluctant to recognize exceptions in a statute when there is no basis for the exception in the statutory language. Indeed, to recognize an exception not apparent in the statutory language would be contrary to our effort to neither add nor delete language so as to reflect an intent not evidenced in the plain and unambiguous language of the statute.

*Id.* at 326 (internal citations and quotation marks omitted).

The Court then explained its plain reading of the Local Government TCA was supported by the statutory scheme, observing that, in previous cases, the Local Government TCA's notice requirement "prevented plaintiffs from proceeding on their tort claims,

12

including those involving state constitutional violations." *Id.* at 326. The Court further pointed out the Local Government TCA's own stated purpose is for "establishing a limit on the liability of local government of the State," *id.* at 327, and the legislative history confirmed that the General Assembly intended the Local Government TCA to apply to a wide range of civil actions "in response to a perceived insurance crisis plaguing counties, municipalities[,] and their employees," *id.* at 328. *Espina* concluded "the General Assembly was aware that the [Local Government TCA] would be read as covering a broad range of civil actions, and nonetheless declined to carve out any exceptions." *Id.* at 330.

Finally, the Court observed that the General Assembly responded to its decision in *Housing Authority of Baltimore City v. Bennett*, 359 Md. 356 (2000), in which our Supreme Court "held that the [Local Government TCA] damage cap did not apply to any tort actions where the local government itself is a defendant[,]" by passing an "emergency measure clarifying that the monetary limits on the liability of a local government under the [the Local Government TCA] apply to claims against local governments when named as defendants[.]" *Id.* (internal quotation marks omitted). Further,

> [T]he General Assembly explained in the uncodified sections 2 and 3 of the emergency legislation, that "it is the intent of the General Assembly that the **total liability** of a local government, directly or otherwise, in an action arising from tortious acts or omissions, may not exceed the limits on liability" and that the "Act shall apply to **any claim for damages** under [the Local Government TCA]" respectively.

*Id.* at 331 (emphasis in original) (citing 2001 Laws of Maryland Chapter 286).

More recently, in *Williams v. Morgan State Univ.*, the Supreme Court of Maryland limited the seemingly broad definition of torts espoused in *Espina* when it held the

13

Maryland TCA's limited waiver of the State's sovereign immunity for a "tort action" did not include federal statutory claims and made multiple statements suggesting "tort action" did not include state statutory claims either. 484 Md. 534, 544–55 (2023).

*Williams* first explained why its holdings in *Espina*, *Green*, and *Lee* did not "broaden the definition of 'tort' either generally for all statutes or for purposes of the [Maryland TCA] specifically." *Id.* at 550. *Williams* then explained that the holding in *Green* "was not that the plaintiff's Maryland Consumer Protection Act claim was a 'tort action,' but that it was 'a personal injury action' to which CJP § 11-108 applied," and "the General Assembly had not intended to narrow the [Maryland Consumer Protection Act]'s application, which previously reached all personal injury actions, so that it was limited only to common law torts." *Id.* at 549–50. For that reason, *Williams* stated that *Espina*'s use of the Black's Law Dictionary definition was meant to be a narrow discussion of the holding in *Green*, "was not dispositive[,]" and did not, as the County contends here, expand the definition of a tort. In general, the Court said *Espina* was "not otherwise relevant to the issues presented in this case" and "did not concern either the [Maryland TCA] specifically or statutory claims in general." *Id.* at 549–50. As for *Lee v. Cline*, *Williams* stated: "Although it is certainly correct that our opinion in *Lee* stands for the proposition that 'tort action,' in the [Maryland TCA] is not limited only to common law torts . . . it provides no support for Appellant's contention that the phrase extends to statutory claims." *Id.* at 550.

*Williams* then discussed five "textual and contextual reasons that cause us to conclude that the General Assembly did not intend the phrase 'tort action' to extend to statutory claims generally, and especially not to federal statutory claims." *Id.* at 550. Three

14

of those reasons were specific to the legislative history of the Maryland TCA and sovereign immunity, which are not at issue here, but two of the reasons provide some guidance on interpreting the scope of the Local Government TCA. First, the Court stated it "has never held that 'tort action' or any similar phrase, either as used in the [Maryland TCA] or in any other statute, applies generally to State statutory claims." *Id.* at 551. Further on this point, the Court reiterated that its holding in *Green* "was limited to the scope of CJP § 11-108" and did not shed light on the General Assembly's intent for the scope of waiving sovereign immunity for tort actions in the Maryland TCA. *Id.*

Next, *Williams* explained "the purpose of the [Maryland TCA]'s immunity is to insulate state employees generally from tort liability[,]" which

> is satisfied for state common law and constitutional torts by substituting the State's liability for that of State personnel who would otherwise be liable. For State statutory claims, however, the imposition and scope of liability is a legislative choice made by the General Assembly. In other words, unlike in the case of common law and constitutional torts, in crafting a State statute containing a private right of action, the General Assembly has the ability to place liability where it chooses. It would be unnecessary to resort to a separate statutory scheme, like the [Maryland TCA], to allocate liability for State statutory claims.
>
> * * * *
>
> Adopting Appellant's expansive definition of "a tort action," thus, would eliminate the General Assembly's exercise of control in defining the scope of the State's liability.

*Id.* at 552–53 (internal citations omitted). In the conclusion of its plain text reading, the Court in *Williams* held the Maryland TCA's waiver of the State's sovereign immunity for a tort action did not extend to federal statutory causes of action and further stated:

15

Ultimately, we need not decide whether the [Maryland TCA] waives sovereign immunity generally for state statutory claims that sound in tort. If it does, such a waiver would necessarily be limited to state statutory claims that are not covered by another waiver of sovereign immunity specific to the scheme. *See, e.g.*, *Proctor*, 412 Md. at 720, 990 A.2d 1048 (stating that the Maryland TCA applies only "when no other preexisting waiver of sovereign immunity exists").

*Id.* at 554–55.

The Supreme Court's analysis and reasoning in *Espina* and *Williams* convince us that the General Assembly did not intend the term "tortious actions and omissions" in the Local Government TCA to include statutory discrimination and retaliation claims under the Maryland Fair Employment Practices Act or Prince George's County Code.

Although *Espina* seemingly defined torts broadly, *Williams* made it clear that the definitions in *Espina* were only part of a discussion about the reasoning in *Green*, which, in turn, was a narrow ruling interpreting the term "personal injuries" in the non-economic damages cap of CJP § 11-108. *Id.* at 549. The Court in *Williams* explained that the definitions of "tort action" and "tortious acts or omissions" were not to be given a broad reading extending to all "civil wrongs" across all Maryland law in all contexts, although those terms are also not necessarily "limited only to common law torts." *Id.* at 550 (citations omitted). Additionally, the fact that "constitutional torts" was a commonly used term in previous cases was important to *Espina*'s decision but has no parallel here. 442 Md. at 325–26.[10]

---

[10] Indeed, as Watts points out in his brief, some courts in other jurisdictions have expressed an opinion that employment discrimination is not a tort, albeit in different

16

In addition to the plain text, we are further convinced nothing in the Local Government TCA's statutory construction or purpose shows the General Assembly intended "tortious acts or omissions" in the Act to extend to statutory employment discrimination and retaliation claims under the Maryland Fair Employment Practices Act and Prince George's County Code.

The Court in *Espina* found evidence that the Local Government TCA extended to constitutional tort claims because Maryland courts previously ruled that plaintiffs asserting constitutional claims had to comply with the Local Government TCA's notice requirement in order to bring a claim. 442 Md. at 326. In *Hansen v. City of Laurel*, our Supreme Court held that Hansen was required to plead facts showing he satisfied the Local Government TCA's notice provision as a condition precedent to filing his lawsuit against the City for employment discrimination. 420 Md. 670, 672–73 (2011). However, this is not dispositive

---

contexts that do not address the issues here. *See, e.g.*, *Jones v. Blair Wellness Center, LLC*, No. ADC-21-2606, 2023 WL 4352451, at *7 (D. Md. June 30, 2023) ("Because Plaintiff's Title VII claims are not torts . . . ."); *Roberts v. Off. of the Sheriff for Charles Cnty.*, No. DKC 10–3359, 2012 WL 12762, at *11 (D. Md. Jan. 3, 2012) ("Furthermore, even if the notice requirement of the [Maryland TCA] were broadly applicable to all tort actions, employment discrimination is not a tort."); *Jancey v. Sch. Comm. of Everett*, 421 Mass. 482, 501 (1995) ("[E]ven though wage discrimination has historical connections to common law tort and contract claims, acts of discrimination—whether intentional or unintentional—do not thereby become torts.") (internal citations and quotation marks omitted).

in showing the Local Government TCA extends to employment discrimination claims.[11]

As our Supreme Court in *Williams* explained:

> Our decision in *Hansen* concerned compliance with notice and pleading requirements. It did not address waiver or the meaning of "tort action" or any similar phrase. Indeed, the notice requirement at issue in *Hansen* requires a claimant to provide notice of any "action for unliquidated damages," not just tort actions, "brought against a local government or its employees." *Id.* at 676 n.4, 25 A.3d 122 (quoting the then-applicable version of CJP § 5-304(b)(1)). We began our discussion by noting the "longstanding principle of Maryland jurisprudence that the [Local Government TCA] notice provision is a condition precedent to maintaining an action"—not just a tort action— "directly against a local government or its employees." *Id.* at 682, 25 A.3d 122. *Hansen*, therefore, is inapposite.

484 Md. at 548 n.7.

The Local Government TCA's purpose does not suggest it was meant to extend to Watts' damages either. In *Espina*, the Court observed the purpose of the Local Government TCA was for "establishing a limit on the liability of local governments" because, as the legislative history showed, the General Assembly passed the Local Government TCA "in response to a perceived insurance crisis plaguing counties, municipalities, and their employees." 442 Md. at 327–28. Additionally, the Local Government TCA was meant to protect and indemnify local government employees by requiring local governments to provide a legal defense and indemnify employees for judgments against them. CJP § 5-303(b) ("A local government may not assert governmental or sovereign immunity to avoid

---

[11] The *Hansen* Court does not say whether Hansen sued for employment discrimination under the Maryland Fair Employment Practices Act. 420 Md. at 674 n.3 ("Hansen's suit advanced theories of recovery based on age and disability discrimination under state and local laws prohibiting same.").

the duty to defend or indemnify an employee established in this subsection."); *see Balt. City Police Dep't v. Potts*, 468 Md. 265, 318–19 (2020) (explaining one of the Local Government TCA's purposes was "to ensure that the financial burden of compensation is carried by the local government that is ultimately responsible for its employees' acts") (citation and quotation marks omitted) (cleaned up).

However, enacting the Local Government TCA was not necessary to establish a limit on liability for claims or indemnify employees for causes of action under the Maryland Fair Employment Practices Act for the same reason that the Maryland TCA immunity waiver's purpose would not be satisfied by including state and federal statutory claims in the definition of "tort action": "the imposition and scope of liability is a legislative choice made by the General Assembly . . . . [T]he General Assembly has the ability to place liability where it chooses." *Williams*, 484 Md. at 552. "In other words, unlike in the case of common law and constitutional torts, in crafting a State statute containing a private right of action, the General Assembly has the ability to place liability where it chooses." *Id.* If the General Assembly needed to limit liability of employment discrimination and retaliation claims through a damages cap, it could have done so by amending the Maryland Fair Employment Practices, which makes it "unnecessary to resort to a separate statutory scheme, like the [Local Government TCA], to allocate liability for State statutory claims." *Id.*

Indeed, the General Assembly does control liability exposure for discrimination and retaliation claims in the Maryland Fair Employment Practices Act through its own waiver

of sovereign immunity for the "State, its officers, and its units[,]"[12] SG § 20-903, and procedures for a plaintiff to bring a civil action that, among other things, requires the action to be brought within 2 years after the alleged unlawful employment practice occurred, SG § 20-1013(a); *see also* SG § 20-1202(c)(1) (requiring notice of an employment discrimination claim in Howard, Montgomery, and Prince George's Counties be brought within 2 years). The Maryland Fair Employment Practices Act also declines to create special rules for employment discrimination cases where a State or local government employee is the respondent. SG § 20-902 ("In an employment discrimination case in which a unit, officer, or employee of the State, a county, or a municipality is a respondent, the rules, procedures, powers, rights, and remedies that apply are the same as those that apply in a discrimination case in which a private person is the respondent."). If the General Assembly intended to limit liability of local governments for employment discrimination further through a damages cap, it could have done so in the Maryland Fair Employment Practices Act directly. Adopting an expansive definition of "tortious acts or omissions" in the Local Government TCA to include claims under the Maryland Fair Employment Practices Act "would eliminate the General Assembly's exercise of control in defining the scope of the State's liability." *Williams*, 484 Md. at 552–53.

The holding in *Williams* was specific to federal statutory causes of action, but the Court cast strong doubt on the idea that "tort action" or any similar phrase in the Maryland

---

[12] Watts also argues Prince George's County waived its own immunity when it defined "employer" subject to the anti-discrimination ordinance, to include the "Prince George's County Government." PGCC § 2-186(a)(8).

TCA or Local Government TCA included any state statutory causes of action. We will not go so far as to hold that "tortious act or omission" does not include any statutory causes of action, but the *Williams* Court's reasoning certainly applies to Watts' claims under the Maryland Fair Employment Practices Act and Prince George's County Code. Just as with waivers of sovereign immunity for "tort actions" in the Maryland TCA, we will "neither add nor delete language so as to reflect an intent not evidenced in the plain and unambiguous language of the statute" in order to limit liability through a damages cap, *ab silentio*, when the General Assembly could have done so by amending the Maryland Fair Employment Practices Act directly. *Id.* at 555 (quoting *Wheeling v. Selene Finance LP*, 473 Md. 356, 376–77 (2021)). Although the Court's opinion in *Green* suggests "tort," "tort action," and "tortious acts or omissions" could include more than common law torts—including, possibly, discrimination, retaliation, and other civil wrongs outlawed in other statutes—the text, statutory construction, and purpose of the Local Government TCA do not convince us the General Assembly intended "tortious acts or omissions" to include discrimination and retaliation claims under the Maryland Fair Employment Practices Act, thereby limiting State or local government liability for Watts' discrimination and retaliation claims.

Because we hold the Local Government TCA's statutory damages cap does not apply to Watts' discrimination and retaliation claims, we need not address his contentions related to the Local Government TCA's application to his award for back and front pay or whether the claims are one or two occurrences. Accordingly, we reverse the judgment of the circuit court and remand for further proceedings consistent with this opinion. In

21

reviewing the award on remand, the circuit court may consider any of other grounds raised in the County's motion notwithstanding the verdict, or in the alternative, motion for remittitur, and motion for a new trial.

**JUDGMENT OF THE CIRCUIT COURT FOR PRINCE GEORGE'S COUNTY IS REVERSED AND REMANDED FOR FURTHER PROCEEDINGS CONSISTENT WITH THIS OPINION. APPELLEE TO PAY THE COSTS.**